
Exhibit B

**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| JESSICA JONES and CHRISTINA LORENZEN, on Behalf of Themselves and All Others Similarly Situated, | ) ) ) | |
| the Indirect Purchasers, | ) ) | No. 2:20-cv-02892-SHL-cgc |
| v. | ) ) | |
| VARSITY BRANDS, LLC, et al., | ) ) | |
| Defendants. | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS U.S.
ALL STAR FEDERATION, INC., JEFF WEBB, VARSITY BRANDS, LLC, AND
VARSITY SPIRIT FASHION & SUPPLIES, INC.'S MOTIONS TO DISMISS**

Before the Court are three Motions to Dismiss: first, Defendant U.S. All Star Federation, Inc.'s ("USASF") Motion to Dismiss, (ECF No. 57), Plaintiffs Jessica Jones and Christina Lorenzen's (together, "Indirect Purchasers") Response, (ECF No. 69), and USASF's Reply (ECF No. 74); second, Defendant Jeff Webb's Motion to Dismiss, (ECF No. 58), the Indirect Purchasers' Response, (ECF No. 71), and Webb's Reply (ECF No. 75); and, last, Defendants Varsity Brands, LLC and Varsity Spirit Fashion & Supplies, Inc.'s (together, "Varsity Defendants") Motion to Dismiss, (ECF No. 59), the Indirect Purchasers' Response, (ECF No. 68), and Varsity Defendants' Reply.  (ECF No. 73.)

The Indirect Purchasers seek to represent a class of indirect purchasers of Varsity products and services.  They bring six claims for relief, including injunctive relief under § 16 of the Clayton Act for violations of §§ 1, 2, and 3 of the Sherman Act (count 1); damages under the antitrust and consumer protection laws of 31 states (counts 2, 3, 4); alternatively, a claim for

unjust enrichment under Tennessee law (count 5); and declaratory relief for violations of §§ 1, 2, and 3 of the Sherman Act (count 6).

Defendants move to dismiss all of the Indirect Purchasers' claims. They contend that the Indirect Purchasers fail to plead a claim under the Sherman Act by failing to allege proper markets, failing to plead USASF or Webb's involvement in a conspiracy, and failing to allege anticompetitive conduct. They also contend that the Indirect Purchasers' state law claims fail because the underlying federal law claims fail, and, even if the federal law claims survive dismissal, the state law claims are insufficiently pled. Finally, Defendants argue that the Indirect Purchasers' declaratory judgment claim is superfluous.

Based on the below analysis, the Court **DENIES** Defendants' Motions to Dismiss the Indirect Purchasers' claims for injunctive and declaratory relief under §§ 1, 2, and 3 of the Sherman Act. As to Defendants' Motions to Dismiss their state antitrust and consumer protection claims, the Court:

- **GRANTS** Defendants' Motion as to the Tennessee antitrust statute's applicability to the Cheer Camp and Cheer Competitions markets, but **DENIES** the Motion as to its applicability to the Cheer Apparel Market;
- **GRANTS** the Motion as to claims asserted under the state antitrust and consumer protection laws of Alaska, Colorado, Illinois, and Alabama, as well as the consumer protection laws of Tennessee;
- **DENIES** the Motion as to claims asserted under the state antitrust and consumer protection laws of Arizona, Arkansas, Mississippi, South Dakota, West Virginia, the District of Columbia, Nevada, New York, Wisconsin, and Utah; and
- **DENIES** the Motion on standing grounds.

The Court also **DENIES** the Motion as to the Indirect Purchasers' claims for unjust enrichment.

# BACKGROUND[1]

Varsity[2] is a prominent host of competitive cheerleading competitions and camps.  The company advanced the modern style of cheer, in which the athletes performing cheer routines are the "main event" – requiring year-round training and summer camps for athletes to maintain their strength, flexibility, coordination and teamwork.  (ECF No. 1 at PageID 14.)

The story of Varsity began when Jeff Webb, a former University of Oklahoma cheerleader, founded the Universal Cheerleaders Association ("UCA") to develop a new focus on cheerleading tournaments "created solely for cheer squads," which differed from the approach employed by earlier cheer organizations like the National Cheerleaders Association ("NCA"), Webb's former employer.  (Id. at PageID 21.)  Ultimately, the UCA became a subsidiary and part of the collection of companies known as Varsity.  (Id.)

As the industry grew, Varsity began acquiring other cheerleading businesses, apparel companies and event producers.  (Id. at PageID 22-24.)  Varsity also joined other entities to create the U.S. All Star Federation ("USASF") in 2003, individually providing a $1.8 million interest free loan to kickstart the rule-setting organization.  (Id. at PageID 25.)  The USASF is a Memphis, Tennessee-based corporation which sets or enforces rules governing Cheer Competitions and also organizes and manages Cheer Competitions throughout the country.  (Id. at PageID 8.)  According to the Complaint, "Varsity controlled USASF from its inception" – from submitting the USASF's trademark application, housing the USASF's offices at Varsity's corporate address, to paying the salaries for USASF employees.  (Id. at PageID 25-26.)  Varsity

---

[1] This recitation of facts is based on the Indirect Purchasers' Complaint, (ECF No. 1), assumed to be true for the purposes of this Order.

[2] The Indirect Purchasers define "Varsity" as the collective term to represent Varsity Brands, LLC, Varsity Spirit, LLC, and Varsity Fashion & Supplies, LLC.  (ECF No. 1 at PageID 4.)

holds a controlling number of seats on USASF's Board of Directors, including all of the seats with voting rights.  (Id. at PageID 26.)  By maintaining influence in the leadership of the USASF and "other rule-making organizations," Varsity allegedly "exercise[d] control over the Competitive cheer industry and enhance[d] and maintain[ed] its monopoly power in the [r]elevant [m]arkets."  (Id. at PageID 27.)

The Indirect Purchasers' Complaint alleges three markets in which Varsity Defendants, USASF and Webb engaged.  First, Cheer Competitions.  Competitive Cheer athletes perform on teams at about six competitions a year, participating in competitions that are "local, regional, or national in scope."  (Id. at PageID 4.)  There are two allegedly relevant Competitive Cheer divisions: (1) All-Star Cheer, where teams are affiliated with private gyms, and (2) School Cheer, where teams are affiliated with middle schools, high schools, or colleges.  (Id. at PageID 15.)

Varsity operates "the largest and most prestigious Cheer Competitions in the United States."  (Id. at PageID 24.)  Only All-Star Cheer teams participate in All-Star Cheer Competitions.  (Id. at PageID 16.)  USASF usually defines the divisions for participants to compete in All-Star Cheer Competitions, and All-Star Gyms organize them.  (Id.)  According to the Indirect Purchasers, "[p]articipants pay to compete, including fees for events, USASF registration fees, music licensing and insurance."  (Id.)

Varsity is not the only host of All-Star Cheer Competitions, but it is the primary supplier. (Id. at PageID 38.)  In 2015, following acquisitions of its major rivals National Spirit Group, Spirit Festival, Spirit Holdings, and Cheer Limited, Varsity acquired its "largest remaining competitor," The JAM Brands, which was the second largest event host.  (Id. at PageID 22-23.) After this last acquisition,  registration fees for All-Star Cheer competitions increased.  (Id. at

PageID 24.)

Many students participate in both All-Star and School Cheer competitions, either at different periods throughout a year or simultaneously.  (ECF No. 1 at PageID 17.)  Varsity-owned organizations promote school competitions, and host "the largest middle and high school Nationals in the country."  (Id. at PageID 16.)  According to the Indirect Purchasers, Varsity "exercises near complete control" over the regulating organizations for school cheer.  (Id. at PageID 17.)  In 2017, Varsity created the Impact Program, through which Varsity supplies schools with merchandise in exchange for an agreement for the school to attend Varsity Cheer Competitions and buy Varsity Cheer Apparel.  (Id.)

Second, in the Cheer Camps market, cheer athletes participate in overnight camps, normally in the summer, to practice their skills and routines.  (Id. at PageID 18.)  "Varsity is the largest Cheer Camp operator in the world," controlling over 75% of the alleged market and the "premier Cheer Camps in the country."  (Id. at PageID 19.)

The last alleged market is Cheer Apparel.  Varsity sells cheerleading apparel and gear, and is the "largest 'K-through-Colleges' sales force of Cheer Apparel in the United States." (ECF No. 1 at PageID 24.)  According to the Indirect Purchasers, Varsity prohibits other retailers from selling apparel or gear at the competitions it hosts.[3]  (Id.)

Alleged as part of these markets, Varsity offers "exclusive agreements": the "Family Plan," the "Network Agreement," and the Impact and VIP Branding Program ("Impact Program").  (Id. at PageID 33-34.)  First, the Family Plan provides discounts and rebates for

---

[3] It is not clear that this failure to accommodate competitors is actionable under prevailing antitrust law, which generally does not require firms to share their advantage or resources with others.  Because this allegation is not necessary to the resolution of this Motion, the Court will not discuss whether it could constitute an antitrust violation.

apparel if All-Star gyms and schools sign an agreement to attend at least six Varsity competitions per year and purchase Varsity Cheer Apparel.  (ECF No. 1 at PageID 33-34.)  Because All-Star Gym competitive teams "often attend only Six Cheer Competitions in a season," this means gyms will attend only or primarily Varsity events.  (Id. at PageID 34.)  Further, the Family Plan rebates are usually in the form of "Varsity Fashion Dollars," only to be used on future Varsity purchases – therefore capturing gyms in "an endless cycle" whereby it would cost gyms more and more to patronize Varsity's competitors because they would forego these rebates.  (Id.)

The Network Agreement, catered to the "larger and more prestigious All-Star Gyms," requires All-Star Gyms to send their cheer teams to at least five Varsity-produced competitions each season, spend at least $30,000 on Varsity registration fees, and exclusively purchase and use Varsity Cheer Apparel in exchange for increasing rebates.  (Id. at PageID 33 ("The more Varsity Competitions an All-Star Gym attends, and the more Varsity Cheer Apparel an All-Star Gym purchases, the larger the rebate to that All-Star Gym.").)  Because gyms must spend these threshold amounts and because All-Star Gyms usually attend only six competitions in a season, these contractual requirements mean gyms will attend only or primarily Varsity events.  (Id.) The last alleged exclusive agreement is the Impact Program, through which Varsity supplies schools with merchandise in exchange for an agreement that the school will attend Varsity Cheer Competitions and buy Varsity Cheer Apparel.  (Id. at PageID 17.)

Plaintiffs Jessica Jones and Christina Lorenzen[4] are the parents of Competitive Cheer Athletes who were members of either All-Star Gym teams or school cheer teams.  (Id. at

_____

[4] On April 6, 2022, the Court entered an Order Granting Plaintiffs' Unopposed Motion to Drop Party Under Fed. R. Civ. P. 21, (ECF No. 250), and instructed the Clerk of Court to remove Michelle Velotta from the docket as a named Plaintiff in the litigation.  Thus, Jessica Jones and Christina Lorenzen are the remaining named Plaintiffs.

PageID 6.)  They allege that they paid artificially inflated prices for goods and services, including enrollment in cheer competitions and apparel purchased indirectly from Varsity, and they seek to represent a class of all indirect purchasers of Varsity products and all entrants into Varsity or All-Star Cheer Competitions.  (Id.)  Ms. Jones is a citizen and resident of Kansas, and Ms. Lorenzen is a citizen and resident of Colorado.  (Id. at PageID 6-7.)

In their Complaint, the Indirect Purchasers allege that Defendants engaged in an exclusionary scheme in all three markets by: (1) creating a system of bids[5] for admission to national tournaments as a means to funnel athletes to its own local and regional tournaments, thereby preventing rivals from entering the industry; (2) creating and enforcing restrictive rules that favor Varsity and deny competitors a "foothold" in the industry; (3) using exclusive agreements with gyms and schools to limit access to the relevant markets; (4) limiting access to the Cheer Apparel and Cheer Camp markets by using its monopoly power; and (5) counter-programming rival competitions to deprive them of revenue streams.  (ECF No. 1 at PageID 29-38.)  Thus, the Indirect Purchasers allege that Defendants' exclusionary scheme violates Sections 1, 2, and 3 of the Sherman Act, 15 U.S.C. §§ 1 – 3, and seek injunctive and declaratory relief for these violations.  (ECF No. 1.)  They also allege that Defendants violated the antitrust and consumer protection laws of 31 states, and, alternatively, that Defendants benefitted from higher profits resulting from the Indirect Purchasers' overpayments to them, and should be compelled to disgorge all proceeds that they unjustly derived from their anticompetitive scheme.  (Id.)

---

[5] The "Bid system" operates under rules "agreed to by Varsity and USASF," where Cheer teams must secure a Varsity Bid to attend "most of Varsity or USASF's Championship competitions." (ECF No. 1 at PageID 29.)  Teams secure bids by attending and winning Varsity-owned and operated competitions.  (Id.)

All of the Defendants moved to dismiss the Indirect Purchasers' Complaint on March 12, 2021.[6]  (ECF Nos. 57-60.)  Defendant USASF contends that the Indirect Purchasers fail to plead a claim under §§ 1, 2, or 3 of the Sherman Act because they do not (1) connect USASF with their alleged § 2 violation, (2) plead proper markets, and (3) plead USASF's involvement in a conspiracy.  (ECF No. 57-1.)  USASF also asserts that the Indirect Purchasers fail to state a plausible antitrust claim under any state antitrust and consumer protection law and that their declaratory relief claim is superfluous.  (Id.)

Defendant Webb argues that the Indirect Purchasers "cast their net too wide" by including him in their Complaint.  (ECF No. 58-1 at PageID 287.)  He contends that their claims for declaratory and injunctive relief against him fail because he does not pose a threat of committing future antitrust violations, and because the Indirect Purchasers fail to allege facts supporting claims under the Sherman Act.  Joined by Varsity Defendants and USASF, Webb also argues that the state law claims fail to allege the requisite intrastate effect in eleven jurisdictions under their respective state laws, and cannot be brought because the Indirect Purchasers lack a right to bring causes of action in five jurisdictions.  Moreover, Webb contends that the Indirect Purchasers' state consumer protection claims fail to satisfy Federal Rule 8's pleading requirements, and that their unjust enrichment claim fails because the Indirect Purchasers do not allege a benefit conferred on Webb.  (Id. at PageID 306-07.)

Varsity Defendants argue that they did not engage in anticompetitive conduct.  (ECF No. 59.)  Specifically, they contend that the Indirect Purchasers have engaged in shot-gun

---

[6] Defendants Charlesbank and Bain's separate allegations are addressed in a separate Order. However, this Order incorporates the Court's previous conclusion that they are considered as a joint enterprise with Varsity regarding the Indirect Purchasers' Sherman Act claims against Varsity.  (See ECF No. 332.)

pleading and have not alleged (1) appropriate markets, (2) anticompetitive conduct, (3) Varsity's monopoly power, or (4) agreements in restraint of trade or conspiracy.  Varsity argues that it dominates the All-Star competitions, cheer camps and cheer apparel markets because it pioneered the sport and has a reputation superior to that of any competitor.  (Id.)

Defendants' contentions as to how they came to be in a central position in the world of competitive cheer may be true.  However, at the Motion to Dismiss stage, the Court must accept all allegations in the Complaint as true.  Considering those allegations, the Court finds that the Indirect Purchasers sufficiently allege their claims under federal law, and sufficiently allege some – but not all – of their antitrust and consumer protection claims under state law.

## LEGAL STANDARD

A Rule 12(b)(6) motion tests the legal sufficiency of a complaint.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  To overcome a Rule 12(b)(6) motion, a complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Id.  In reviewing the complaint under this standard, the court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff."  DirecTV, Inc. v. Treesh, 487 F.3d 471, 476 (6th Cir. 2007)). Indeed, a court cannot disbelieve the facts as alleged by the plaintiffs.  Cupp v. Alberto-Culver USA, Inc., 310 F. Supp. 2d 963, 968-69 (W.D. Tenn. 2004).  However, the complaint "must contain either direct or inferential allegations respecting all the material elements [of the claim] to sustain a recovery under some viable legal theory," see First Am. Title Co. v. Devaugh, 480 F.3d 438, 444 (6th Cir. 2007), and "legal conclusions or unwarranted factual inferences should not be accepted as true."  Cupp, 310 F. Supp. 2d at 968–69.

"Unfortunately, there is no general agreement on the exact standards to use when resolving antitrust cases." In re Se. Milk Antitrust Litig., 739 F.3d 262, 270 (6th Cir. 2014). However, the Court will consider both that "summary procedures should be used sparingly in complex antitrust litigation" due to the fact-heavy nature of the claims, and that discovery in an antitrust action carries high costs. Poller v. Columbia Broad. Sys., Inc., 368 U.S. 464, 473 (1962); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 558 (2007) (cautioning courts to remember that "proceeding to antitrust discovery can be expensive").

## ANALYSIS

The claims against Defendants arise under §§ 1, 2, and 3 of the Sherman Act,[7] state antitrust laws and state consumer protection laws. The Court analyzes Defendants' Motion to Dismiss the federal law claims first before proceeding to the state law claims.

### I.   Sherman Act § 1 Claims[8]

§ 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce … is declared to be illegal." 15 U.S.C. § 1. Defendants challenge this claim by contending that (1) the Indirect Purchasers fail to plead that there were exclusive contracts, (2) Defendants are not capable of conspiring with one another, and (3) the allegations of conspiracy are insufficiently pled. However, the Court finds

---

[7] Under the Sherman Act, the language of § 3 "is virtually the same as § 1's, but extends § 1's prohibitions to U.S. territories and the District of Columbia." Robinson v. Jackson Hewitt, Inc., No. 19-9066 (SDW) (LDW), 2019 WL 5617512, at *5, n.7 (D.N.J. Oct. 31, 2019). Thus, this Court will analyze Plaintiffs' § 1 and § 3 claims using the same standards.

[8] Defendants also argue that the Indirect Purchasers cannot state a claim for unlawful "bundling," or grouping discounts for different products under the Sherman Act. (ECF No. 59-1 at PageID 333.) However, the Indirect Purchasers allege improper exclusive dealing, not improper bundling. (See ECF No. 68 at PageID 436.) Thus, the Court will not discuss whether Defendants' conduct constitutes improper bundling.

that the Indirect Purchasers sufficiently plead violations of § 1 of the Sherman Act and **DENIES**

Defendants' Motion to Dismiss these claims.

### A.   Exclusive Dealing[9]

Exclusive dealing is an agreement between a supplier and a consumer that the consumer

will only purchase a product from the supplier.  See Herbert Hovenkamp, Federal Antitrust

Policy: The Law of Competition and its Practice § 10.9, at 430 (2d ed. 1999).  Exclusive dealing,

even by a monopolist, is not a per se violation of the Sherman Act unless there is substantial

market foreclosure.  Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327 (1961).  Thus,

exclusive dealing may violate the Sherman Act if "performance of the contract will foreclose

competition in a substantial share of the line of commerce affected."  Id. at 327.  "[F]oreclosure

levels are unlikely to be of concern where they are less than 30 or 40 percent."  B & H Med.,

L.L.C. v. ABP Admin., Inc., 526 F.3d 257, 266 (6th Cir. 2008) (citing Stop & Shop Supermarket

Co. v. Blue Cross & Blue Shield of R.I., 373 F.3d 57, 68 (1st Cir. 2004)).

Defendants argue that the Complaint's allegations do not constitute exclusive dealing as

to the Family Plan, Network Agreement, and the Impact Program.  (ECF Nos. 57-1, 73.)

Specifically, they contend that substantial foreclosure resulting from either the Family Plan or

Network Agreement is insufficiently pled, as the Indirect Purchasers do not allege a number of

gyms tied up in these exclusive agreements or the percentage of the relevant market share that

the gyms constitute.  (ECF No. 57-1 at PageID 271-72.)  Moreover, Defendants argue that

Varsity's Network Agreements and Family Plans should not be considered together to allege

market foreclosure, as Family Plans are not "exclusionary" as a matter of law.  (ECF No. 73 at

---

[9] Exclusionary contracts may also be considered as anticompetitive conduct in deciding claims
under § 2 of the Sherman Act.  LePage's Inc. v. 3M, 324 F.3d 141, 157 (3d Cir. 2003).  Thus, the
Court's analysis here also applies to Plaintiffs' § 2 claims.

PageID 570.)  Finally, as to the Impact Program, Defendants contend that, even if true that schools made exclusive agreements with Varsity in exchange for certain services, the Indirect Purchasers fail to allege substantial foreclosure of a market or below-cost pricing resulting from such allegedly exclusive agreements.  (Id. at 570-71.)

In response, the Indirect Purchasers argue that they sufficiently plead all three exclusive agreements as violations.  (ECF No. 68 at PageID 433.)  As for the Network Agreement, the Indirect Purchasers state that it "require[s] All-Star Gyms to have their Competitive Cheer Teams attend at least five Varsity-produced Cheer Competitions per season and spend at least $30,000 on registration fees for Varsity events."  (Id. (citing ECF No. 1 at ¶ 143).)  Because the Network Agreement "explicitly require[s] the most prominent and successful All-Star Gyms to purchase and use Varsity Cheer Apparel exclusively," the Indirect Purchasers argue that it is an exclusive agreement.  (Id. at PageID 434-35.)  The Indirect Purchasers allege that Varsity engages with the remaining smaller gyms through the Family Plan, which "requires that an All-Star Gym attend six Varsity Cheer Competitions in one year in order to obtain a small amount of relief from Varsity's penalty pricing on Cheer Apparel and Cheer Competitions."  (Id. (citing Id. at ¶¶ 146-47).)   As teams only attend six to eight Cheer Competitions per season, the Indirect Purchasers argue that the Family Plan is also effectively exclusionary.  (Id. at PageID 434.)

The Indirect Purchasers also contend that Varsity engages in exclusive dealing through its Impact Program.  Explaining that Varsity offers schools the opportunity to purchase branding services in exchange for signing "VIP Agreements under which the schools agree to purchase their uniforms, apparel, and equipment from Varsity and to compete in Varsity Cheer Competitions,"  (ECF No. 68 at PageID 435 (citing ECF No. 1 at ¶ 151)), the Indirect Purchasers argue that this conduct limits competitors' market share, inflates prices above competitive levels,

and limits consumer choice – thus foreclosing competition from competition producers and apparel manufacturers.  (Id. (citing id. at ¶¶ 151-52).)

The Indirect Purchasers sufficiently allege three exclusionary contracts: Varsity's Network Agreement, its Family Plan, and the Impact Program.  The Network Agreements are explicitly exclusionary, requiring consumers to buy apparel only from Varsity.  The Family Plan is effectively exclusionary, making it infeasible for gyms to attend the events of competitors outside of the number of Varsity events they are obligated to attend.  Finally, the Impact Program is also exclusionary, requiring exclusivity in exchange for the purchase of Varsity's services.

Next, based on (1) the Indirect Purchasers' allegation that 100% of the All-Star Gyms are eligible for the Family Plan, and that Varsity instead engages the most prominent of those gyms for the Network Agreement, and (2) Defendants' alleged market share of 80% in both the Cheer Competitions Market and the Cheer Apparel Market, it is plausible that at least 30-40% of gyms have entered into either the Family Plan or Network Agreement.  (ECF No. 1 at PageID 13, 33-34.)  At this stage, when the exact information at issue is within Defendant's exclusive control and there are sufficient allegations of high levels of exclusive agreements, dismissal is not appropriate.  See, e.g., In re Text Messaging Antitrust Litig., 630 F.3d 622, 629 (7th Cir. 2010) ("The plaintiffs have conducted no discovery.  Discovery may reveal the smoking gun or bring to light additional circumstantial evidence that further tilts the balance in favor of liability.").  The Indirect Purchasers plausibly allege that a substantial share of the market is tied up—they allege that Defendants have a vast majority of the market power, and that it would be impracticable for most gyms to operate without the discounts that come when they agree to purchase exclusively from Varsity.

As for the substantial foreclosure resulting from the Impact Program, the Indirect

Purchasers sufficiently plead that the program forecloses some competition, but not necessarily

that it foreclosures a substantial share of the market.  However, the Indirect Purchasers also

argue that its allegations of the effects of foreclosure are "cumulative."  (ECF No. 68 at

PageID 434.)  With the All-Star gyms' portion of the market substantially tied up due to the

effects of the Network Agreement and Family Plan, it is plausible that the Impact Program

contributes to foreclosure in the Cheer Competitions and Cheer Apparel Markets.  Furthermore,

even if the Court questions the level of market foreclosure, it does not find cause to dismiss this

claim for failure to show substantial foreclosure at this stage of the litigation.  See

Commonwealth of Kentucky v. Marathon Petroleum Co., LP, 191 F. Supp. 3d 694, 702 (W.D.

Ky. 2016) ("It would be improper to dismiss this claim at the pleading stage for a failure to show

substantial foreclosure.").  Thus, the Court **DENIES** the Motion at this stage.

**B.   Conspiracy**

1.   Conspiracy with USASF

Defendants attempt to dismantle Plaintiffs' allegations of conspiracy to restrain trade by

arguing that Varsity and USASF are incapable of conspiring under the Sherman Act because

they are treated as one enterprise under Copperweld Corp. v. Indep. Tube Corp., 467 U.S. 752,

771 (1984).[10]  (ECF No. 59-1 at PageID 339-40.)  The Indirect Purchasers respond that, while

the Varsity Defendants and USASF may act as one enterprise, they do not share common

ownership and do not function as an economic unit.  (ECF No. 68 at PageID 439; ECF No. 69 at

---

[10] This analysis also applies to the argument that Defendants are incapable of conspiring under §
2 of the Sherman Act due to the Copperweld doctrine.

PageID 463.)  The Court agrees with Plaintiffs – these entities are capable of conspiring under the Sherman Act.

A violation of Sherman Act § 1 requires establishing that the alleged conspirators "had a conscious commitment to a common scheme designed to achieve an unlawful objective." Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 764 (1984).  The Supreme Court established in Copperweld that § 1 does not apply to agreements between separate legal entities if those entities have a "unity of purpose or a common design" due to their ownership or control. Copperweld, 467 U.S. at 752 ("Copperweld doctrine").  However, the Court stated that entities with divergent economic purposes are capable of engaging in a conspiracy with one another.  Id. at 771.

According to Defendants, the Indirect Purchasers allege that USASF is an extension of Varsity – ie., that it "has no independent decision-making or economic purpose and is completely beholden to Varsity."  (ECF No. 57-1 at PageID 278.)  Thus, they argue that USASF and Varsity cannot be considered "separate economic actors pursuing separate economic interests," see Copperweld, 467 U.S. at 769, and instead, as dependent economic actors, they must be considered to have a "unity of purpose or a common design."  (ECF No. 57-1 at PageID 278 (citing Century Oil Tool, Inc. v. Prod. Specialties, Inc., 737 F.2d 1316, 1317 (5th Cir. 1984)); ECF No. 74 at PageID 580.)  Thus, they argue, as a matter of law, there is no conspiracy to monopolize.  (ECF No.  57-1.)

In response, the Indirect Purchasers contend that Varsity Defendants and USASF do not share common ownership and do not function as an economic unit, and therefore cannot have "a unity of purpose."  (ECF No. 68 at PageID 19; ECF No. 69 at PageID 463, n.6.)  According to

the Indirect Purchasers, because USASF is a nonprofit, not a corporate division, and is not a

wholly owned subsidiary of Varsity, <u>Copperweld</u> does not apply.  (ECF No. 69 at PageID 464.)

Varsity and USASF are capable of engaging in conspiracy with one another because they

have divergent economic purposes.  (<u>Id</u>.; ECF No. 1 at PageID 25.)  Varsity is a corporate entity

competing in the market to maximize profits; USASF, on the other hand, is an independent non-

profit organization.  Although Varsity currently holds a majority control of USASF's board, such

control does not change the lawful purpose of USASF to benefit its members, which includes

event producers like Varsity, in contrast to Varsity's different purpose to pursue profit.  Thus, the

Court concludes that Defendant USASF and Varsity are capable of conspiring with one another

under §§ 1 – 3 of the Sherman Act.

Even if the Court finds them to be capable of conspiring, Defendants argue that the

Indirect Purchasers insufficiently allege that they did so.  They argue that (1) any rule-setting

done by Varsity or USASF is not actionable as anticompetitive, and that (2) the Indirect

Purchasers fail to plead USASF's involvement in a conspiracy with Varsity under the rule of

reason test or <u>per se</u> approach.  The Court first addresses the argument that rule-setting is not

anticompetitive.

In response to that argument, the Indirect Purchasers contend that Defendants' actions are

anticompetitive in the context of the full exclusionary scheme.  According to them, Varsity

cannot have "unbridled" authority to set rules regarding tournament participation because doing

so "provides Varsity with leverage to charge supracompetitive prices" in the alleged markets, an

anticompetitive behavior.  (ECF No. 68 at PageID 437.)  Indeed, they point to multiple actions of

USASF and Varsity – USASF's insurance requirements, USASF and Varsity's limitations on

bid-qualifying events, Varsity's hosting of events to draw other teams away from competitors'

16

events, and the USASF's rule requiring that bid-qualifying events be over 500 miles from each other – that allegedly prevent competition or close the market to newcomers.  (ECF No. 1 at PageID 31.)

Here, the Court agrees with the Indirect Purchasers.  Their Complaint alleges coordinated activities between USASF and Varsity that, when taken as true, are plausibly actionable as anticompetitive conduct, including rule-setting for competitions.

Turning to Defendants' next argument, the Court finds that a conclusion as to whether the Indirect Purchasers can satisfy the rule of reason or per se approach applicable to this conspiracy claim is premature at the pleading stage.  An unreasonable restraint of trade resulting from economic activity can be shown by using either of two analytical approaches: the per se rule and the rule of reason.  Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club, 325 F.3d 712, 718 (6th Cir. 2003) (citing Law v. Nat'l Collegiate Athletic Ass'n, 134 F.3d 1010, 1016 (10th Cir. 1998)).  The rule of reason analysis is "most commonly applied" and is "favored by the federal courts in nearly all anti-trust cases."  See Ogden v. Little Caesar Enterprises, Inc., 393 F. Supp. 3d 622, 631 (E.D. Mich. 2019).  However, the fact-intensive analysis is more appropriate to assess on a motion for summary judgment.  (ECF No. 69 at PageID 459 (citing In re High-Tech Employee Antitrust Litig., 856 F. Supp. 2d 1103, 1115 n.9, 1122 (N.D. Cal. 2012)).); see Churchill Downs Inc. v. Thoroughbred Horsemen's Grp., LLC, 605 F. Supp. 2d 870, 891 (W.D. Ky. 2009) (". . . the Court may perform a rule of reason analysis following discovery.")  Thus, the Court will await discovery to analyze the Indirect Purchasers' allegations under these approaches.

## 2.  Conspiracy with Webb

Defendants argue that the Indirect Purchasers do not plausibly allege a conspiracy

involving Webb "because it is well-established that an officer cannot agree or conspire with his employer to give rise to antitrust liability." (ECF No. 58-1 at PageID 298 (citing Smith v. N. Michigan Hospitals, Inc., 703 F.2d 942, 951 (6th Cir. 1983)). However, the Indirect Purchasers argue that Webb, as an officer of the corporation, can be held individually liable where the antitrust conspiracy was among several entities and persons, not simply Webb and Varsity, his employer. (ECF No. 71 at PageID 524.) They further argue that his personal participation in the anticompetitive conduct imposes liability on him.

Webb correctly argues that he cannot conspire with his employer. See First Med Representatives, LLC. v. Futura Med. Corp., 195 F. Supp. 2d 917, 928 (E.D. Mich. 2002) (finding that individual defendants, when acting on behalf of a corporation, cannot have conspired with their own corporation in violation of the antitrust laws). However, because the conspiracy claim is alleged as between Varsity, Webb, USASF, and others, Copperweld does not bar his liability. See Deaktor v. Fox Grocery Co., 332 F. Supp. 536, 542 (W.D. Pa. 1971), aff'd, 475 F.2d 1112 (3d Cir. 1973).

Moreover, as to Webb's individual involvement, it is "undisputed that a corporation's officers and agents may be held individually liable for corporate actions that violate the antitrust laws if they authorize or participate in the unlawful acts." Brown v. Donco Enterprises, Inc., 783 F.2d 644, 646 (6th Cir. 1986) (citing United States v. Memphis Retail Package Stores Association, 334 F.Supp. 686, 689 (W.D.Tenn. 1971)). Thus:

> Individual liability under the antitrust laws can be imposed only where corporate agents are actively and knowingly engaged in a scheme designed to achieve anticompetitive ends. To support a determination of liability under this standard, the evidence must demonstrate that a defendant exerted his influence so as to shape corporate intentions.

Id. at 646.[11]

The Indirect Purchasers allege that Webb played an active role in directing acquisitions of event producers, apparel manufacturers, and camp providers; played a role in policy-setting; and invested in cheer governing bodies.  (ECF No. 1 at ¶¶ 98, 107, 118.)  Construing these allegations in a light most favorable to Plaintiffs, it is plausible that Webb, as CEO, was both "actively and knowingly engaged" in Varsity's alleged anticompetitive scheme within the relevant markets.  Brown, 783 F. 2d at 646.  Moreover, a CEO plausibly has the directional control in a company to "shape corporate intentions."  Id.  The Court therefore **DENIES** Defendants' Motion to Dismiss this claim under Copperweld.

## II.      Sherman Act § 2 Claims

In their Motions to Dismiss, Defendants argue that the Indirect Purchasers do not sufficiently allege monopoly power, relevant product or geographic markets, or willful anticompetitive conduct, and thus fail to allege their monopoly claim.  Defendant Webb also argues that Plaintiffs insufficiently plead a conspiracy to monopolize claim against him.  Because the Court finds that the Indirect Purchasers allege sufficient facts to state claims for monopolization and conspiracy to monopolize, these Motions are **DENIED**.  Each argument is addressed separately below.

---

[11] While the Sixth Circuit referenced a possibly higher standard to find an individual liable in Murphy Tugboat Co. v. Shipowners Merchs. Towboat Co., 467 F. Supp. 841, 852 (N.D. Cal. 1979), it did not explicitly adopt this higher standard, and neither have other lower courts in the Circuit.  See In re Southeastern Milk Antitrust Litigation, 801 F. Supp. 2d 705 (E.D. Tenn. 2011); Churchill Downs Inc. v. Thoroughbred Horsemen's Grp., LLC, 605 F. Supp. 2d 870, 889 (W.D. Ky. 2009).

### A.  Monopoly Power

A monopoly claim requires that (1) Defendants have monopoly power in a certain market (2) obtained or maintained through willful anticompetitive conduct (3) that caused rising prices or lowering of output.  See Conwood Co., L.P. v. U.S. Tobacco Co., 290 F.3d 768, 782 (6th Cir. 2002).  Monopoly power is "a power of controlling prices or unreasonably restricting competition."  United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 389 (1956) (quoting Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 85 (1911)).  Generally, a high market share may establish monopoly power.  United States v. Grinnell Corp., 384 U.S. 563, 571 (1966) ("The existence of such power ordinarily may be inferred from the predominant share of the market.").  "[C]ourts have been quick to find monopoly power where the market share is 75-80% or greater."  Byars v. Bluff City News Co., 609 F.2d 843, 850 (6th Cir. 1979).

There are three markets at issue: Cheer Competitions, Cheer Camps, and Cheer Apparel. Defendants contend that the Indirect Purchasers' allegations are merely generalized complaints about pricing, and thus do not provide a basis to infer monopoly power.  However, the Indirect Purchasers allege that "Varsity controlled approximately 80% of the Cheer Competition Market; 80% of the Cheer Apparel Market and 75% of the Cheer Camp Market."  (ECF No. 1 at PageID 13.)  Further, they allege that prices increased in each market as a result of the exclusionary scheme, while output in each market has "fallen below competitive levels."  (Id. at PageID 50.)  Taking these allegations as true at this stage of the litigation, the Indirect Purchasers sufficiently allege that Varsity held monopoly power in each of the relevant markets.

However, Defendant Webb asserts that the Indirect Purchasers do not support a monopolization claim against him individually.  When monopolization claims under § 2 of the Sherman Act are levied against individual officers of a company, "the Sherman Act does not

impart liability for actions by an individual . . . unless the individual entity possess[es] monopoly power." ES Dev., Inc. v. RWM Enters., Inc., 939 F.2d 547, 554 (8th Cir. 1991) (cited on other grounds in Faulkner's Auto Body Ctr., Inc. v. Covington Pike Toyota, Inc., 50 F. App'x 664, 669 (6th Cir. 2002)).

The Indirect Purchasers do not directly address whether Webb could be liable for a monopolization claim on his own or whether he has monopoly power because they assert a somewhat different claim: that Webb participated in and directed Varsity's actions to monopolize. (See ECF No. 71 at PageID 525 ("As the long time CEO of Varsity, Webb was not only responsible for but directed the conduct of Varsity, including its participation in the alleged anticompetitive scheme").) And it is "undisputed that a corporation's officers and agents may be held individually liable for corporate actions that violate the antitrust laws if they authorize or participate in the unlawful acts." Brown v. Donco Enterprises, Inc., 783 F.2d 644, 646 (6th Cir. 1986) (emphasis added) (citing United States v. Memphis Retail Package Stores Assoc., 334 F.Supp. 686, 689 (W.D. Tenn. 1971)). As stated supra at Section I(B)(2), it is plausible that Webb, as CEO, was both "actively and knowingly engaged" in Varsity's alleged anticompetitive scheme within the relevant markets, and held the directional control within Varsity to "shape [its] corporate intentions." Brown, 783 F. 2d at 646. The Court **DENIES** Webb's Motion as to the Indirect Purchasers' monopolization claim because the Indirect Purchasers sufficiently allege his active engagement in Varsity's alleged anticompetitive scheme. Now, the Court turns to whether those markets are sufficiently defined.

### B. Relevant Markets

To properly allege a monopoly claim under § 2 of the Sherman Act, Plaintiffs must plead both the geographic and product markets that they contend are subject to defendants' monopoly

power.  Total Benefits Plan v. Anthem Blue Cross and Blue Shield, 552 F.3d 430, 437 (6th Cir.

2008).  Defendants argue that all of the markets are improperly defined.  (ECF No. 57-1 at

PageID 268.)  However, the Court finds that the Indirect Purchasers adequately pled all of their

product and geographic markets.

### 1. Product Markets

Defendants argue that all three product markets fail for lack of establishing reasonable

interchangeability, a conclusion that the Indirect Purchasers oppose.  The Court agrees with the

Indirect Purchasers.

A product market is a group of competitive products or services.  "Courts hesitate to

grant motions to dismiss for failure to plead a relevant product market because market definition

is a fact-intensive inquiry only after a factual inquiry into the commercial realities faced by the

consumers [is undertaken]."  United States v. Blue Cross Blue Shield of Michigan, 809

F.Supp.2d 665, 672 (E.D. Mich. 2011) (citing Todd v. Exxon Corp., 275 F.3d 191, 199-200 (2d

Cir. 2001); Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 467 (1992)).  To

constitute a product market, products or services must be "reasonably interchangeable" in both

(1) function and (2) consumer response or "cross-elasticity," defined as "consumer sensitivity to

price levels at which they elect substitutes for the defendant's product or service."  Kentucky

Speedway, LLC v. Nat'l Ass'n Stock Car Racing, Inc., 588 F.3d 908, 917 (6th Cir. 2009).  The

proposed market should encompass all interchangeable substitute products.

Multiple product submarkets can make up a broader market where they are related, like

supplies for a certain purpose—together they may constitute a proper product market for

purposes of alleging a monopoly claim.  See, e.g., FTC v. Staples, Inc., 970 F. Supp. 1066 (1997)

(recognizing "consumable office supplies" as a submarket with individual products ranging from

legal pads to CDs).  "In short, a core group of particularly dedicated, 'distinct customers,' paying

'distinct prices,' may constitute a recognizable submarket, whether they are dedicated because

they need a complete 'cluster of products,' because their particular circumstances dictate that a

product 'is the only realistic choice,' or because they find a particular product 'uniquely

attractive.'"  F.T.C. v. Whole Foods Mkt., Inc., 548 F.3d 1028, 1039 (D.C. Cir. 2008) (quoting,

respectively, Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962); United States v. Phila.

Nat'l Bank, 374 U.S. 321, 356 (1963); SuperTurf, Inc. v. Monsanto Co., 660 F.2d 1275, 1278

(8th Cir. 1981); Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of the Univ. of Okla., 468 U.S.

85, 112 (1984) (internal citations omitted).

The "practical indicia" for determining whether a submarket exists include "industry or

public recognition of the submarket as a separate economic entity, the product's peculiar

characteristics and uses, unique production facilities, distinct customers, distinct prices,

sensitivity to price changes, and specialized vendors."  Brown Shoe, 370 U.S. at 325.

Realistically, most markets will have smaller submarkets, and they will also themselves be

submarkets.  See F.T.C., 970 F. Supp at 1075 (e.g., staplers are a submarket within the office

supply store market, which is itself a submarket of the office supplies market which includes

sales at non-specialized stores like Wal-Mart).

In addition to these indicators of reasonable interchangeability, the Sixth Circuit

recognizes the application of the method referred to as the Small but Significant Non-Transitory

Increase in Price (or "SSNIP") Test to determine the reasonable interchangeability of markets in

a relevant product market.  See In re Southeastern Milk Antitrust Litig., 739 F.3d 262, 282-83

(6th Cir. 2014).  Under this test,

If a hypothetical monopolist could increase the price of its product by a small but
significant amount, usually around 5 percent, and realize a profit from the increase, the

test suggests the product market is properly defined.  On the other hand, if the price increase results in consumers shifting to alternative products, the relevant product market must be expanded to include those substitute products. . . . The test asks whether sellers would take their products outside the proposed market upon the suppression of the price offered by the buyer.

Encana Oil & Gas, Inc. v. Zaremba Fam. Farms, Inc., No. 1:12-CV-369, 2015 WL 12883545, at

*4 (W.D. Mich. Sept. 18, 2015); see also In re Southeastern Milk, 739 F.3d at 282.

Here, as described below, the Indirect Purchasers adequately allege three product

markets: the Cheer Competition Market, the Cheer Camp Market, and Cheer Apparel Markets.

a.   The Cheer Competition Market

Defendants argue that the Indirect Purchasers improperly plead the Cheer Competition

Market as a single market with two divisions:[12] All-Star Cheer, where teams are affiliated with

private gyms, and School Cheer, where teams are affiliated with middle schools, high schools, or

colleges.  (ECF No. 1 at PageID 15.)  Specifically, Defendants argue that the Indirect Purchasers

fail to address how All Star Competitions and School Competitions can be alleged in the same

market, as they cannot serve as substitutes for one another, they involve a different level of

prestige and competition, and they perform in independent, non-overlapping forums.  (ECF No.

59-1 at PageID 328; ECF No. 73 at PageID 566.)  Defendant USASF emphasizes the lack of

interchangeability through the market's inclusion of championship events, which are not

reasonable substitutes for "all other competitions . . . at some lower echelon."  (ECF No. 57-1 at

PageID 271.)  Alternatively, Defendants argue that, in the Indirect Purchasers' efforts to "cherry-

---

[12] The Indirect Purchasers also allege that there is a separate division of Competitive Cheer – "Youth & Recreation Cheer" – where teams affiliate with a recreational organization, like the YMCA, or do not have an affiliation.  (ECF No. 1 at PageID 15.)  However, because the Indirect Purchasers assert that Varsity controls only 10% of this market, they do not include the market in their claims.  (Id.)

pick[]" products, they exclude closer substitutes for All-Star cheer like "youth & recreation cheer," which bolsters the incorrect scope of their market.  (ECF No. 59-1 at PageID 328-29.)

    In response, the Indirect Purchasers point to courts' concerns with dismissing a claim based on market definition at this stage of the litigation.  (ECF No. 68 at PageID 426.)  They also rely on the "cluster"-based model of alleging product markets, where a cluster of services that can be considered a "distinct line of commerce" is a single market.  (Id. (citing United States v. Grinnell Corp., 384 U.S. 563, 572 (1966) (finding fire alarm systems and burglar alarm systems in the same market of accredited central station services, still meeting the "reasonable interchangeability" test).)  Thus, they argue that Cheer Competitions are its own distinct line of commerce, with rough substitutes existing within the defined market.  (ECF No. 68 at PageID 427.)

    Further, the Indirect Purchasers argue that Competitive Cheer is both functionally and economically separate from other types of cheer – including traditional sideline cheerleading, recreational cheer, other gymnastic competitions that emphasize different sets of skills and body types, and college-level competitive dance or acrobatic events involving only female athletes – which require a different set of talents than competitive cheer's "unique combination of talents." (ECF No. 1 at PageID 39.)  Finally, they argue that the market passes the SSNIP Test "as it is, at minimum, plausible that a significant increase in the price of All-Star Competitions would cause enough cheerleaders and their families to switch from All-Star Cheer Competitions to exclusively participating in School Cheer Competitions to make such a price increase unprofitable."  (ECF No. 68 at PageID 428.)

    The Indirect Purchasers adequately allege a product market for Cheer Competitions.  The standard required for a product market requires that the goods be "reasonably" interchangeable,

not perfectly or exactly interchangeable.  <u>Kentucky Speedway</u>, 588 F.3d at 917.  It is plausible

that cheer competitions themselves constitute "a distinct line of commerce," <u>see</u> <u>Grinnell</u>, 384

U.S. at 573, where companies, to compete effectively, may be pressured to offer "all or nearly all

types of service."  <u>Id</u>.  Further, it is plausible that the customers of cheer competitions see the

"cluster of products" as their "only realistic choice."  <u>SuperTurf, Inc. v. Monsanto Co.</u>, 660 F.2d

1275, 1278 (8th Cir. 1981).

      In <u>Rock v. Nat'l Collegiate Athletic Ass'n</u>, No. 1:12-cv-1019-JMS-DKL, 2013 WL

4479815, at *10 (S.D. Ind. Aug. 16, 2013), discussed by both Parties, the court found a market

for Division 1 football sufficiently defined with two subdivisions.  While the court noted that the

market <u>may</u> be overbroad due to "quality distinctions" between the best and worst student

athletes competing in the market or the best and worst schools involved in the market, it

concluded that the scope of the market was not "facially implausible" at the motion to dismiss

stage.  <u>Id</u>. at *11.  The court emphasized that its conclusions did not endorse the market as

properly defined when higher burdens of proof were applied to its definition, stating that

"[w]hether [the plaintiff] can gather enough evidence to prove that the relevant market he pleads

is correct is a question for another day."  <u>Id</u>. at *14.  Likewise, here, while there are quality

distinctions between certain All-Star Cheer Competitions and scholastic competitions, the

Indirect Purchasers have still proposed a facially plausible market at this stage of the litigation.

Whether the market has a properly defined scope at a later phase of litigation "is a question for

another day."  <u>See</u> <u>id</u>.

      This market also plausibly passes the SSNIP Test.   In response to Defendants' argument

that it is "entirely implausible" that an All-Star Cheerleader would switch to School Cheer if

faced with a small price increase – comparing the situation to a consumer "forego[ing] an NBA

game in favor of a local high school game if the price of NBA tickets slightly increased, (see ECF No. 73 at PageID 567) – the Court rather finds the circumstances of moving from a competitive gym-affiliated team to a competitive school-affiliated team less drastic for these athletes than consumers of NBA games choosing to attend a high school game.  It is plausible that cheerleaders, already engaged in both levels of cheer competitions, could be influenced to participate exclusively in school cheer competitions if the price of All-Star Competitions were to significantly increase.  (See ECF No. 68 at PageID 428.)  Thus, the Indirect Purchasers sufficiently plead a product market for Cheer Competitions.

> b.  Cheer Camp Market

The Indirect Purchasers allege one product market including cheer camps for each "level" of cheer, including school, All-Star, youth and recreational, and for both day and overnight camps.  (ECF No. 1 at ¶¶ 62, 65, 158, 202.)  Defendants argue that the market fails because it is facially implausible that the Indirect Purchasers satisfy the SSNIP test; "an overnight camp is obviously an entirely different commitment than a day camp, with concomitant differences in economics," and Defendants argue that this difference makes it difficult to believe that a SSNIP "in overnight Cheer Camps would cause enough families to switch from overnight Cheer Camps to day Cheer Camps to make such a price increase unprofitable."  (ECF No. 73 at PageID 568 (citing ECF No. 68 at PageID 428).)

In response, the Indirect Purchasers first assert that a small price increase in overnight camps may cause families to switch to day camps.  They also emphasize the year-round nature of competitive cheer, thus surmising that "athletes could plausibly attend both types of camps or

alternate between them given changing conditions (budget, teams' strategy, proximity to home, etc.)." (ECF No. 68 at PageID 428.)

The Indirect Purchasers plausibly allege that cheer athletes may alternate between attending overnight camps and day camps given the balance between (1) a range of factors on their affordability, and (2) the importance of camps to a cheerleaders' skill development and ability to attend events. Plaintiffs allege that competitive cheer is expensive; thus, a 5% increase in a certain product or service could influence parents or their families to opt for a more affordable day camp in place of a longer overnight camp. It is therefore plausible to include those substitute camps – day camps in place of overnight camps – within the same product market. See Encana Oil, No. 1:12-cv-369, 2015 WL 12883545, at *4 (W.D. Mich. Sept. 18, 2015).

c.   Cheer Apparel Market

This proposed market includes "uniforms, warm-up outfits, team jerseys and practice gear; and specialized accessories such as hair bows and headbands; and specialized equipment such as backpacks and shoes." (ECF No. 1 at ¶ 189.) Defendants contend that this proposed market fails because its products are not reasonably interchangeable – instead, the Indirect Purchasers created "an artificial distinction between apparel, such as warm-up gear, used by competitive cheer teams, and the functionally identical apparel used for other athletic endeavors." (ECF No. 59-1 at PageID 327; ECF No. 57-1 at PageID 270.) They assert that the "cluster-market concept" is inapplicable because certain packages of products are sold to schools, rather than to All Star participants, and are therefore not purchased or even used together. (ECF No. 73 at PageID 555-56.) According to Defendants, by alleging that the USASF regulates All-Star (but not school) competition apparel, and that gyms (not schools)

require certain apparel and equipment for practice and for membership on their competitive

cheer teams, the Indirect Purchasers undermine their allegation that this is a cluster market.  (Id.

at PageID 556.)

In response, the Indirect Purchasers rely on the "cluster of services" argument to satisfy

reasonable interchangeability.  They argue that there are no close or sufficient substitutes in the

Cheer Apparel Market, as the "commercial reality" is that specialized apparel and equipment for

cheerleading is wholly governed by USASF rules, is required for practice, and is required for

membership on All-Star Cheer teams.  (ECF No. 68 at PageID 428-29 (citing ECF No. 1 at ¶¶

187, 188, 189.)  Thus, they contend that there is no opportunity to purchase generic apparel or

"piecemeal purchase" because, "athletes and their families are required to purchase entire

uniforms from their school or All Star Gym."  (Id. at PageID 429 (citing ECF No. 1 at ¶ 189).)

The Indirect Purchasers allege a sufficient product market.  Taking their allegations as

true, a combination of products satisfies the unique needs of a school or gym, and these products

are bought by gyms or schools in a group of products, rather than in "piecemeal" purchases.  See

United States v. Cent. State Bank, 891 F.2d 292 (6th Cir. 1989).  And defining a product market

is "highly factual" and can "require[] analysis of relevant expert opinion, testimony to

understand the dynamics of the product market, and documentary evidence."  Comprehensive

Sec., Inc. v. Metro. Gov't of Nashville & Davidson Cty., Tennessee, No. 21-5617, 2022 WL

670135, at *4 (6th Cir. Mar. 7, 2022).  Further scrutiny applies at later stages, but the Indirect

Purchasers' allegations survive this stage of the litigation.

2. <u>Geographic Markets</u>

A geographic market is "an area of effective competition."  Conwood Co., L.P. v. U.S.

Tobacco Co., 290 F.3d 768, 782 (6th Cir. 2002) (quoting Re/Max Int'l, Inc. v. Realty One, Inc.,

173 F.3d 995, 1016 (6th Cir.1999)).  It is the area to which consumers could turn for alternatives if a defendant raised its prices.  In re Se. Milk Antitrust Litig., 739 F.3d 262, 277 (6th Cir. 2014).  Outlining a geographic market is often "fact-intensive."  Id.  Defendants challenge the Indirect Purchasers' alleged national scope of the geographic market for all three product markets, arguing that the scope is either too broad or too narrow.  For all three markets, the Indirect Purchasers allege that the geographic market is the United States as a whole.  (ECF No. 1 at PageID 38, 40, 43.)  The Court finds that the geographic markets are sufficiently pled.

a.   Cheer Competition Market

Moving to dismiss the Indirect Purchasers' nationwide market in which Competitive Cheer Teams compete in regional and local competitions to receive bids for attending Competitive Cheer Championships, Defendants argue that the Indirect Purchasers fail to allege that "price differences between competitions in different areas of the country would attract teams from outside an area where lower prices prevail."  (ECF No. 59-1 at PageID 329; ECF No. 57-1 at PageID 271.)  They argue that one could not conclude, for example, that a gym in northern Georgia could viably substitute a competition in Seattle with one in Atlanta.  (ECF No. 73 at PageID 567.)  Alternatively, Defendants also contend that international competitions cannot be excluded from this market "on the basis of travel costs while disregarding domestic travel costs in defining the geographic market."  (ECF No. 57-1 at PageID 271-72 (arguing that traveling between upstate New York and Canada may be cheaper than travelling from upstate New York to Alabama).)

In response, the Indirect Purchasers concede that teams attend competitions "that maximize their chances of winning [b]ids to the end-of-season events," even if those are regionally based.  (ECF No. 1 at PageID 40.)  However, they still argue that the events are

administered nationally, they share the same national governing bodies and follow the same rules, and that bid allocations are centrally controlled.  (Id.)  Moreover, the "primary goal" for Competitive Cheer teams is performing to win a national title, even if the bid to qualify for the national competition is obtained from a regional competition.  (ECF No. 68 at PageID 429-30.)  Relying on Grinnell, a case in which the court rejected considering whether consumers would travel nationally to purchase burglar or fire alarms in favor of viewing the "broader national market that reflects the reality of the way in which they built and conduct their business," see id. at 576,  the Indirect Purchasers contend that Varsity built a national structure of competition that "allowed it to 'nationalize' what otherwise may have been more regional competitions or qualifying events."  (ECF No. 1 at PageID 40; ECF No. 68 at PageID 429.)  Finally, the Indirect Purchasers argue that international cheer competitions do not functionally or economically operate as a substitute for U.S. cheer competitions because "the expense of international travel" impedes regular traffic from U.S. All-Star teams and schools, a prohibition which even a "small but significant . . increase in participating in U.S. Cheer Competitions" would not change.  (ECF No. 1 at PageID 39-40.)  They also emphasize that international competitions operate by different rules, which disincentivizes teams from seeking out these competitions.  (Id.)

The Indirect Purchasers sufficiently allege a geographic market.  The geographic market analysis is fact specific and may require additional support at later phases of litigation.  In re Se. Milk Antitrust Litig., 739 F.3d at 277.  However, at the pleadings stage, the allegation that the structure of competitive cheer competitions within the United States is distinctly national is sufficient to make the United States a plausible geographic market.  See Re/Max Int'l, Inc. v. Realty One, Inc., 173 F.3d 995, 1016 (6th Cir. 1999).  While Defendants argue that not all national competitions are more affordable than international competitions, they do not address

the point that international competitions operate by different rules and regulations – a factor that could plausibly cause a competitor to stay within familiar rules and regulations set on a national level.  The Indirect Purchasers' allegations therefore establish that there are no effective competition competitors outside of the United States, and the area of competition in this market also spans the United States as a whole.

b.   Cheer Camp Market

Defendants challenge the Indirect Purchasers' allegation of a national geographic market for cheer camps, contending that the Indirect Purchasers admit the market is regional, not national, when stating that "for teams, there may be a regional sense of camps they would realistically attend."  (ECF No. 59-1 at PageID 330 (citing ECF No. 1 at PageID 46).)  They also argue that the Indirect Purchasers do not address practical limitations on travel for camps – and "whether, for example, a cheer camp in Memphis competes with one in Seattle."  (ECF No. 73 at PageID 569.)

The Indirect Purchasers respond that, while teams may realistically attend regionally-based camps, "Varsity's monopoly has allowed it to govern, manage, produce and design camps at a national level."  (ECF No. 1 at PageID 46.)  They emphasize that Varsity provides bids to national competitions from cheer camps held across the United States, so teams are generally incentivized to attend camps, regardless of regional location.  (ECF No. 68 at PageID 430.)

The Indirect Purchasers sufficiently allege a geographic market for Cheer Camps.  They allege that cheer camps are a distinctly national training opportunity for teams, as well as an opportunity to qualify for the U.S.-based championship events.  The Indirect Purchasers' allegations thus establish that there are no effective Cheer Camp competitors outside of the United States, and the area of competition in this market spans the United States as a whole.

32

c.   Cheer Apparel Market

As to the Cheer Apparel market, Defendants emphasize that a geographic market must be the market "to which the purchaser can practicably turn for supplies."  (ECF No. 59-1 at PageID 330 (citing Phila. Nat'l Bank, 374 U.S. at 359 (internal citations omitted)).)  With that in mind, Defendants argue that the Indirect Purchasers only allege a geographic scope for where customers of Cheer Apparel reside, but not where geographically those customers – gyms, in this instance – could turn to acquire apparel.  (ECF No. 59-1 at PageID 327.)  Without defining the geographic scope of where the purchasers could turn to buy Cheer Apparel, Defendants contend that the Indirect Purchasers lack a basis "to exclude the rest of the world from the relevant market," especially given the prevalence of apparel manufactured overseas.  (Id. at PageID 327.)  Moreover, Defendants argue that the Indirect Purchasers' allegation of apparel sold online opens the market scope internationally.  (ECF No. 57-1 at PageID 270.)

In response, the Indirect Purchasers contend that, because all competitions in the Cheer Competitions market take place within the United States and are regulated by Varsity-controlled organizations, "nearly all of the targeted customers for Cheer Apparel reside in the United States."  (ECF No. 1 at PageID 44, 46.)  They do not respond to Defendants' argument that the geographic scope is not consumers' residences, but the area in which they acquire apparel – but they do state that no particular U.S. location depends on in-store apparel due to Defendants' online sales platform.

The Indirect Purchasers allege a geographic market of the United States sufficient to survive a motion to dismiss.  Without a brick-and-mortar presence, gyms based around the United States could plausibly turn to Defendants' online, U.S.-based presence to purchase Cheer Apparel.  Further, because rules and regulations regarding apparel in the Cheer Competitions

market are distinct from international competitions, it is plausible that the United States is the area of competition for this market – not international suppliers.  Moreover, because Varsity is the dominant player in the Cheer Apparel Market and is a U.S. based company, it is plausible that there would not be effective apparel competitors outside of the United States.

In sum, based on the above analysis of the alleged monopoly power and market definitions, the Indirect Purchasers sufficiently allege the first element of a monopoly claim – that Defendants have monopoly power in the alleged markets.

### C.  Willful Anticompetitive Conduct

A monopoly claim also requires that Defendants obtained or maintained monopoly power through willful anticompetitive conduct that caused rising prices or the lowering of output, the second and third elements of this claim.  See Conwood Co., L.P. v. U.S. Tobacco Co., 290 F.3d 768, 782 (6th Cir. 2002).

In their Motions to Dismiss, Defendants argue that the Indirect Purchasers simply characterize their success as "anticompetitive," and their business practices as "exclusionary," but do not actually allege anticompetitive conduct.  (ECF No. 59-1 at PageID 330-31.)   Thus, they argue that the Indirect Purchasers' allegations of anticompetitive conduct fail, including their allegations of (1) illegal exclusive dealing and the restraint of trade,[13] (2) anticompetitive acquisitions, and (3) the restriction on competition (including offering competing events, setting exclusionary rules of competition, and requiring insurance).  In response, the Indirect Purchasers contend that they plausibly allege anticompetitive conduct in connection with an alleged

---

[13] The Order addressed exclusive dealing above, see supra Section I(A), and the Court does not reconsider it here.

anticompetitive scheme, which includes anticompetitive acquisitions, rule-making and other practices to reduce competition, and exclusive agreements.  (ECF No. 68 at PageID 431.)

The Court addresses each allegation in turn, but also considers the cumulative effect of all alleged anticompetitive conduct.  See Cont'l Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699 (1962).  In doing so, the Court concludes that there are adequate allegations of willful anticompetitive conduct to survive these Motions to Dismiss.

### 1. Acquisitions of Competitors

Acquisitions constitute willful anticompetitive conduct where they lead to monopoly and exclude competition.  United States v. Grinnell Corp., 384 U.S. 563, 576 (1966).  "The 'ultimate inquiry in merger analysis' is . . . 'whether the merger is likely to create or enhance market power or facilitate its exercise.'"  ProMedica Health Sys., Inc. v. F.T.C., 749 F.3d 559, 570 (6th Cir. 2014) (quoting Carl Shapiro, The 2010 Horizontal Merger Guidelines: From Hedgehog to Fox in Forty Years, 77 Antitrust L.J. 49, 57 (2010)).  If a firm has dominant market power, it has the ability to harm consumers by raising prices, reducing output, or diminishing innovation "as a result of diminished competitive constraints or incentives."  Id. at 565 (quoting Horizontal Merger Guidelines (2010) ("Merger Guidelines") § 1 at 2).

Varsity Defendants argue that "virtually all" of the acquisitions alleged by the Indirect Purchasers were made outside the statute of limitations period, and thus cannot be considered. (ECF No. 59-1 at PageID 339.)  Further, they argue that even those acquisitions within the statute of limitations are not actionable because the Indirect Purchasers fail to allege how they were anticompetitive.  (Id.)

The Indirect Purchasers allege that Defendants acquired competitors and rivals within all three markets in such a way so as "to clear the field" of actual and potential rivals and cause

increased prices.  (ECF No. 68 at PageID 438 (citing ECF No. 1 at ¶¶ 41, 228).)  Moreover, they

argue that all of Defendants' acquisitions should be considered because they are "continuing"

violations, as the Defendants' accrual of monopoly power occurred over more than the past four

years.  (Id.)

As stated in the Court's Order Denying Defendants Bain Capital Private Equity, LP and

Charlesbank Capital Partners, LLC's Motion to Dismiss, (ECF No. 332), parties may allege a

"continuing antitrust" violation under the Sherman Act – that is, when a party's interests "are

repeatedly invaded."  Peck v. Gen. Motors Corp., 894 F.2d 844, 849 (6th Cir. 1990).  Continuing

violations are treated differently between conspiracy and monopolization claims, both of which

Plaintiffs allege.  Whereas continuing violations are "intuitive" for conspiracy claims, they may

only be applied in monopolization claims "where a party . . . undertook action, in addition to

price increases, to monopolize a market."  Z Techs. Corp. v. Lubrizol Corp., 753 F.3d 594, 598

(6th Cir. 2014) ("None of the cited cases indicate that a price increase following a merger or

acquisition, by itself, extends the statute of limitations.") (emphasis added).

For both the conspiracy and monopolization claims, the Indirect Purchasers sufficiently

allege anticompetitive conduct that involves – but is not solely reliant on – acquisitions, and

therefore constitute continuing violations.  They allege that Defendants have acquired other

entities and therefore increased their market power and caused higher prices.  See ECF No. 1 at

¶ 97 ("In 2016-2017, following its acquisition of The JAM Brands, Varsity continued to acquire

actual or potential competitors in the Cheer Competition Market, including Aloha Productions,

Spirit Celebrations, Mardi Gras Spirit, and Team Epic Brands.")  They have also alleged

subsequent raising prices – including a price increase for registration fees for Cheer

Competitions occurring at some point in 2016, after its 2015 acquisition of Jam Brands.  (See id.

at ¶ 96.)  Moreover, viewing all alleged anticompetitive conduct in the aggregate, without "tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each," see Cont'l Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699 (1962), means that these allegations are viewed alongside allegations of exclusive agreements and restriction of competition through other means, as seen infra at Section C(2).  Alleged overt acts stretch beyond the statutory limitations period.  Thus, the Court will consider these acquisitions as part of the aggregate of Defendants' alleged anticompetitive conduct.

2. Restricting Competition

Defendants also argue that Plaintiffs improperly allege that Varsity's practice of offering competition events, its rule-setting, and USASF's insurance requirements are anticompetitive. (ECF No. 73 at PageID 573.)  In response, the Indirect Purchasers respond that, even if certain activities, like hosting competing events, "could possibly be pro-competitive if taken by a non-monopolist, it does not remain so [when] done by a monopolist within the context of an Exclusionary Scheme."  (ECF No. 68 at PageID 437 (citing LePage's Inc. v. 3M, 324 F.3d 141, 159 (3d Cir. 2003)).)  They argue that Varsity's action impacts other event producers' abilities to profit from or host events.  (Id.)  Likewise, while making eligibility rules for tournaments could be pro-competitive, the Indirect Purchasers allege that, instead, eligibility rules in tournaments reduce competition and provide Varsity with an opportunity to charge supracompetitive prices.  (Id.)  Similarly, a routine action like requiring insurance for All-Star gyms is alleged to prohibit athletes or gyms participating in Varsity events from also participating in events organized by competitors.  (ECF No. 1 at ¶¶ 134-35; see ECF No. 68 at PageID 437-38.)

Viewing all of the Indirect Purchasers' allegations for their cumulative effect, the Indirect

Purchasers allege anticompetitive conduct that is attributable to all Defendants.[14]  By alleging

Defendants' significant share of each relevant market, and by alleging an accumulation of

conduct by all Defendants that – taken as true at this stage – reduces competition, bars

competitors, and increases prices, the Indirect Purchasers sufficiently allege anticompetitive

conduct by Defendants.  Thus, the Court **DENIES** Defendants' Motion as to the allegation of

anticompetitive conduct through these means.

### D.  Conspiracy to Monopolize

A conspiracy to monopolize claim under § 2 of the Sherman Act requires "both an

existence of conspiracy and specific intent to monopolize."  Richter Concrete Corp. v. Hilltop

Concrete Corp., 691 F.2d 818, 827 (6th Cir. 1982).  The Court already determined that the

Indirect Purchasers sufficiently allege the existence of a conspiracy, including as to Defendant

Webb.  See supra Section I.B; see also Carpet Grp. Int'l v. Oriental Rug Importers Ass'n, Inc.,

256 F. Supp. 2d 249, 243 (D.N.J. 2003) ("[I]ndividuals who are incapable themselves of

monopolizing a market, may be found liable for intentionally joining others to do so.").  Varsity

Defendants and Defendant USASF do not assert that Plaintiffs did not sufficiently allege specific

intent.  Thus, their Motions are **DENIED** as to this argument.

In contrast, Defendant Webb argues that the Complaint "is devoid of any allegations that

Mr. Webb possessed the specific intent to monopolize."  (ECF No. 75 at PageID 593.)  Specific

---

[14] The Indirect Purchasers allege that their exclusionary scheme under § 2 of the Sherman Act involves Varsity, USASF, Webb, Bain, Charlesbank, and unnamed co-conspirators.  (ECF No. 1 at PageID 4.)  Further, the Indirect Purchasers describe the "core Defendants" as those including Webb, Varsity Brands, Varsity Spirit, Varsity Spirit Fashion, and USASF – all of whom were included in "directing the Scheme."  (Id. at PageID 52.)  Thus, while USASF and Webb are not specifically named in the claim for relief under § 2 of the Sherman Act in count 1, they are sufficiently alleged to be engaged in Varsity's exclusionary scheme and are thus liable under § 2 of the Sherman Act.

intent may be established by either direct or indirect proof.  See American Tobacco Co. v. U.S., 328 U.S. 781, 809-10 (1946).   When a defendant's alleged actions "are ambiguous and could be motivated by factors other than an attempt to monopolize, the likelihood of success is a factor in determining whether the defendants had the requisite specific intent to monopolize." Re/Max Int'l, Inc. v. Realty One, Inc., 924 F. Supp. 1474, 1490 (N.D. Ohio 1996), aff'd in part, rev'd in part, 173 F.3d 995 (6th Cir. 1999); see also Bailey's, Inc. v. Windsor America, Inc., 948 F.2d 1018 (6th Cir.1991) (finding it "wildly improbable" that defendant's actions were motivated by intent to monopolize when it held less than 10% of the relevant market share).

The Indirect Purchasers' complaint sufficiently alleges Webb's specific intent to monopolize.  For instance, after Varsity acquired a cheerleading apparel company in 2010 and subsequently closed that company's doors, the former CEO of the company "admitted that, '[b]asically he [i.e. Jeff Webb] wanted me out the market.'"  (ECF No. 1 at PageID 24.) Combining that statement with his alleged involvement in other acquisitions, investment decisions, and policy-setting, as well as his employer's market share in each relevant market, the Court finds the allegations plausible at this stage to establish that Webb intended to monopolize as part of the anticompetitive scheme, active either alone or as part of Varsity.

### III.    State Law Claims

In addition to their federal claims for injunctive and declaratory relief, the Indirect Purchasers seek damages under the antitrust and consumer protection laws of 31 states. Defendants[15] argue that these claims should be dismissed for lack of standing and for insufficient

---

[15] Defendant Webb includes this argument in his Motion, (see ECF No. 58-1), and Varsity Defendants and Defendant USASF adopt his arguments in their Motions.

factual allegations under the applicable statutory requirements.  The USASF and Webb also both argue that these claims are insufficiently pled to apply to them.  The Court first addresses the Indirect Purchasers' claims under state antitrust laws, beginning with claims under Tennessee law.

### A.  Count 2: Claims under Tennessee State Law

Count 2 of the Complaint alleges a violation of the Tennessee Trade Practices Act ("TTPA"), Tennessee Code Ann. §§ 47-25-101, et seq., which provides that:

> [all] arrangements, contracts, agreements, trusts, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in the importation or sale of articles imported into this state, ... and all arrangements, contracts, agreements, trusts, or combinations between persons or corporations designed, or which tend, to advance, reduce, or control the price or the cost to the producer or the consumer of any such product or article, are declared to be against public policy, unlawful, and void.

Tenn. Code. Ann. § 47–25–101.

Webb first argues that the TTPA is inapplicable to the Cheer Camp and Cheer Competition markets because it applies only to tangible goods, not intangible services.  (ECF No. 58-1 at PageID 298 (citing Tenn. Code. Ann. § 47–25–101).)  Because the Indirect Purchasers do not respond to this argument, the Court finds that point conceded.  See 4th Leaf, LLC v. City of Grayson, 425 F. Supp. 3d 810, 823 (E.D. Ky. 2019) ("[A] plaintiff generally concedes a defense when they fail to respond to the defendant's argument.").  Thus, the Court **GRANTS** Defendants' Motion as to the applicability of the TTPA to the Cheer Camps and Cheer Competitions markets, leaving only the alleged Cheer Apparel market.

"A federal court exercising supplemental jurisdiction over state law claims is bound to apply the law of the forum state to the same extent as if it were exercising its diversity jurisdiction." German Free State of Bavaria v. Toyobo Co., 480 F. Supp. 2d 948, 955 (W.D. Mich. 2007) (quoting Diamond Computer Sys., Inc. v. SBC Comm., Inc., 424 F. Supp. 2d 970,

978 (E.D. Mich. 2006) (internal citations omitted)).  Applied here, this Court applies Tennessee law to the alleged claims under Tennessee antitrust statutes.

"[A]n indirect purchaser may bring an action under Tennessee Code Annotated section 47-25-106 for conduct in violation of the TTPA even though the indirect purchaser is a non-resident of this state."  Freeman Indus., LLC v. Eastman Chem. Co., 172 S.W.3d 512, 515-17 (Tenn. 2005).  Employing a "substantial effects" standard to determine whether a case falls within the scope of the TTPA, a court must decide "whether the alleged anticompetitive conduct affects Tennessee trade or commerce to a substantial degree."  Id. at 523.  Courts consider "the particular facts of the case" to determine the effects of the anticompetitive conduct, distinct from the conduct itself.  Id.  However, the alleged anticompetitive conduct "need not threaten the demise of Tennessee businesses or affect market prices to substantially affect intrastate commerce."  Id.

Webb argues that the Indirect Purchasers fail to allege a substantial effect on Tennessee commerce because they solely focus on the alleged anticompetitive conduct, rather than the effects that such conduct caused in Tennessee.  (ECF No. 75 at PageID 593-94; ECF No. 58-1 at PageID 299.)  According to him, the Indirect Purchasers only characterize the conduct by alleging a scheme, conspiracy, and "overt acts in furtherance of their scheme" implemented in Tennessee.  (ECF No. 75 at PageID 594.)  Otherwise, their allegations focus on status: Webb as a Tennessee resident, Varsity as a Tennessee corporation, and USASF as a Tennessee non-profit. (Id.; ECF No. 58-1 at PageID 300.)  Additionally, Webb asserts that the only overt acts relevant to the Cheer Apparel market that the Indirect Purchasers identify – manufacturing cheer apparel – "constitute Varsity's unilateral conduct, which is not actionable under the TTPA."  (ECF No. 75 at PageID 594 (citing In re Effexor Antitrust Litig., 357 F. Supp. 3d 363 (D.N.J. 2018)).)

In response, the Indirect Purchasers argue that their allegations "raise a reasonable expectation that discovery will reveal evidence of a substantial effect on the Tennessee economy sufficient to prove a claim under that state's antitrust law."  (ECF No. 69 at PageID 466 (citing In re Wellbutrin XL Antitrust Litig., 260 F.R.D. 143, 166 (E.D. Pa. 2009) (internal quotations omitted)).)  They contend that they allege a substantial effect on Tennessee commerce by alleging that the "anticompetitive scheme was directed, maintained and implemented in Tennessee."  (Id. (citing ECF No. 1 at ¶¶ 241, 243).)  Relying on In re Wellbutrin, they allege that Defendants' sales resulting from the conspiracy led to the Indirect Purchasers paying substantial overcharges, which is actionable as a substantial effect on the Tennessee economy under the TTPA.  (ECF No. 69 at PageID 466 (citing In re Wellbutrin, 260 F.R.D. at 166).)

It is plausible that Defendants' conduct substantially affected Tennessee commerce. While the Indirect Purchasers do mainly focus on the anticompetitive conduct and scheme within Tennessee and its resulting impacts disconnected from Tennessee specifically, they also allege that (1) a putative class of the Indirect Purchasers paid overcharges as a result of Defendants' scheme, (ECF No. 69 at PageID 465-66), and (2) that the proposed class includes "persons . . . that indirectly paid Varsity . . . for . . . Varsity Cheer Apparel in . . . Tennessee."  (ECF No. 1 at PageID 10-11.)  Thus, it is plausible that an unnamed Plaintiff in Tennessee indirectly paid overcharges for Varsity Cheer Apparel within Tennessee, substantially affecting the state's economy.  That conclusion does not depend on Varsity's conduct within the anticompetitive scheme, but rather on the impact to Tennessee's economy.

In Re Wellbutrin, the fact that plaintiffs alleged that they paid "overcharges on a substantial amount of [the drug at issue] across the United States, including [in] Tennessee," factored into the court's denial of the motion to dismiss the TTPA claims, despite the lack of

specificity as to the extent of the impact.  260 F.R.D. at 166.  Here, the named Indirect

Purchasers' allegation of paying for Varsity Cheer Apparel in Tennessee and of generally being

overcharged for their purchases as a result of Defendants' scheme creates an inference sufficient

to plausibly conclude that discovery will reveal evidence of a substantial effect on Tennessee's

economy.  The Court therefore **DENIES** Defendants' Motion to Dismiss the Indirect Purchasers'

TTPA claim as to the Cheer Apparel market.

### B.  Count 3: Other State Law Antitrust Claims

The Indirect Purchasers allege that Defendants violated the antitrust laws of 30 additional

states.  Webb argues that (1) the Indirect Purchasers' claims in ten states and jurisdictions[16] fail

because they do not sufficiently allege an intrastate effect, and (2) the Indirect Purchasers' claims

in five states[17] fail because those states limit the Indirect Purchasers' right to bring causes of

action under those statutes, including their standing under the laws of Utah.  (ECF No. 58-1 at

PageID 302-03.)  Webb does not challenge the state law antitrust claims for the remaining fifteen

states,[18] but USASF challenges the standing of the named Plaintiffs to bring claims under every

state consumer protection act and state antitrust act.  (ECF No. 57-1 at PageID 281.)

In response, the Indirect Purchasers contend that they allege intrastate effects for all state

antitrust laws at issue, and that they are entitled to bring causes of action in Arkansas, Illinois

and Utah.  (ECF No. 71 at PageID 531.)  However, they concede that they do not have a right to

---

[16] Alabama, Arizona, the District of Columbia, Mississippi, Nevada, New York, North Carolina, South Dakota, West Virginia, and Wisconsin.  (ECF No. 58-1 at PageID 300.)

[17] Alaska, Arkansas, Colorado, Illinois, and Utah.  (ECF No. 58-1 at PageID 301.)

[18] California, Hawaii, Idaho, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Nebraska, New Hampshire, New Mexico, North Dakota, Oregon, and Rhode Island (the remaining states in Plaintiffs' complaint.  (ECF No. 1 at PageID 10-11.)

bring causes of action in Alaska or Colorado.  (Id. at n.11.)  Thus, the Court **GRANTS** Defendants' Motion to Dismiss the Indirect Purchasers' claims under Alaska and Colorado law and proceeds to analyze the rest.

        1.  Standing

USASF challenges the standing of the named Plaintiffs to bring claims under every state consumer protection act and state antitrust act,  (ECF No. 57-1 at PageID 281), and Webb challenges their standing under Utah law.  (ECF No. 58-1 at PageID 303 ("[a]lthough the Plaintiffs purport to assert claims on behalf of residents of the State of Utah, none of the Plaintiffs claim to be citizens or residents of Utah.").)  In response, the Indirect Purchasers argue that the question of standing should be considered at the class certification stage.  (ECF No. 69 at PageID 468.)  Specifically as to Utah law, even if standing is considered at the pleading stage, the Indirect Purchasers argue that, the antitrust laws of Utah allow a "person who is a citizen of this state or a resident of this state" who has been injured to bring claims.  (ECF No. 71 at PageID 533.)

"Whether the named plaintiffs 'may assert the rights of absent class members is neither a standing issue nor an Article III case or controversy issue but depends rather on meeting the prerequisites of Rule 23 governing class actions.'"  In re Opana ER Antritrust Litig., 162 F. Supp. 3d 704, 721–22 (N.D. Ill. 2016) (citing Lewis v. Casey, 518 U.S. 343, 395–96, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (Souter, J., concurring in part, dissenting in part, and concurring in the judgment) (alterations and internal quotation marks omitted); see Arreola v. Godinez, 546 F.3d 788, 795 (7th Cir. 2008) (analyzing named plaintiff's standing as a separate inquiry from his entitlement to relief or ability to satisfy the criteria of Rule 23)).  Thus, the Court **DENIES** Defendant's Motion to Dismiss the Indirect Purchasers' claims for lack of standing, as "[t]he

suitability of the named plaintiffs as representatives of the class will be addressed at the class

certification stage." <u>Id.</u>

       2.   <u>Intrastate Effects</u>

      Webb argues that the antitrust laws of Alabama, Arizona, Mississippi, South Dakota, and

West Virginia require a plaintiff to demonstrate that anticompetitive conduct actually occurred

<u>within</u> the state, which the Indirect Purchasers fail to allege.  (ECF No. 58-1 at PageID 300-01

(citing cases).)  In response, the Indirect Purchasers allege that they meet this standard because

"Webb's anticompetitive conduct: (i) deprived the class members in each identified state of the

benefits of competition from less expensive competitions, apparel, equipment, camps, insurance

and accommodations, and (ii) caused class members <u>in each identified state</u> to pay artificially

inflated supracompetitive prices."  (ECF No. 71 at PageID 529 (citing ECF No. 1 at ¶¶ 31, 34)

(emphasis added).)

      The antitrust laws of Arizona, Mississippi, South Dakota, and West Virginia do all

require a measure of intrastate <u>effect</u> within that jurisdiction.[19]  Alabama's antitrust laws, by

---

[19] Ariz. Rev. Stat. §§ 44-1401, 1402 (requiring that the "contract, combination or conspiracy
between two or more persons in restraint of, or to monopolize, trade or commerce" must have
some part of the conduct "within this state"); <u>In re Cast Iron Soil Pipe And Fittings Antitrust
Litig.</u>, No. 1:14-md-2508, 2015 WL 5166014, at *24 (E.D. Tenn. June 24, 2015) ("District
courts that have examined Mississippi's Antitrust Act have construed it 'to require allegations of
at least some activity or conduct occurring in intrastate commerce or trade.'") (citing <u>California
v. Infineon Technologies AG</u>, 531 F.Supp.2d 1124, 1158 (N.D. Cal. 2007)); <u>Sheet Metal
Workers</u>, 737 F. Supp. 2d at 401 (finding that West Virginia's antitrust statute applied to the
alleged conduct because the plaintiffs claimed that the anticompetitive conduct resulted in the
overpricing of a drug in West Virginia); <u>Buscher v. Abbott Labs.</u>, No. 94-C-755, slip op. at 2
(W.Va. Cir. Ct. Kanawha County Jan. 27, 1994) ("[T]he Antitrust Act prohibits a conspiracy that
restrains West Virginia trade or commerce, regardless of the locus of the conspiracy."); <u>In re
Cast Iron Soil Pipe And Fittings Antitrust Litig.</u>, No. 1:14-md-2508, 2015 WL 5166014, at *25
(E.D. Tenn. June 24, 2015) (part of the anticompetitive conduct must "occur within South
Dakota or have an effect within South Dakota"); <u>see also</u> <u>In re New Motor Vehicles Canadian
Exp. Antitrust Litig.</u>, 350 F.Supp.2d 160, 172 (D.Me. 2004) ("plaintiffs need only allege that a
part of the trade or commerce occurred within South Dakota").

contrast, regulate only intrastate <u>conduct</u>.  Ala. Code §§ 8-10-1, et seq.; Ala. Code § 6-5-60(a);

<u>see</u> <u>Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC</u>, 737

F.Supp.2d 380, 429 (E.D. Pa. 2010) (concluding that "antitrust violations as claimed by the

plaintiffs [did] not violate Alabama's antitrust statute because they involve[d] interstate, and not

purely intrastate, conduct"); <u>see</u> <u>also</u> <u>Abbott Labs v. Durrett</u>, 746 So.2d 316, 339 (Ala. 1999)

(Alabama antitrust laws "regulate monopolistic activities that occur 'within this state'—within

the geographic boundaries of [the] state.").  Thus, taking as true the Indirect Purchasers'

allegations, they plead that the Defendants' conduct was interstate – involving Alabama, but not

wholly confined to the state.  (See ECF No. 1 at PageID 13.)   The Court must therefore **GRANT**

Defendants' Motion and **DISMISS** the Indirect Purchasers' claim under Alabama antitrust law

for failing to allege only intrastate conduct.

      As for Arizona, Mississippi, South Dakota, and West Virginia, "the 'intrastate effects'

requirement is met at the pleading stage by a plaintiff's allegations, like those in the instant case,

claiming that the anticompetitive conduct caused supracompetitive price effects in the relevant

jurisdictions."  <u>Hosp. Auth. of Metro. Gov't of Nashville v. Momenta Pharms., Inc.</u>, 353 F. Supp.

3d 678, 695 (M.D. Tenn. 2018) (citing <u>In re Automotive Parts Antitrust Litig.</u>, 29 F.Supp.3d 982,

1010 (E.D. Mich. 2014); <u>see</u> <u>also</u> <u>In re Chocolate Confectionary Antitrust Litig.</u>, 602 F.Supp.2d

538, 581 (M.D. Pa. 2009).)   The Indirect Purchasers have made such a showing of intrastate

effects.  They allege that Defendants' anticompetitive conduct caused them to pay substantial

overcharges, (ECF No. 69 at PageID 465-66; <u>see</u> ECF No. 1 at PageID 4), and their proposed

State Law Damages Class includes those who allegedly purchased items in each jurisdiction.

(See ECF No. 1 at PageID 10-11 (the proposed class including ". . . persons . . . that indirectly

paid Varsity . . .for . . . Varsity Cheer Apparel" in Arizona, Mississippi, South Dakota, and West

Virginia, among other jurisdictions).)  Thus, the Court **DENIES** the Motion to Dismiss the

Indirect Purchasers' claims under the antitrust statutes of these states.

### 3. Substantial Effects

Defendants next argue that the Indirect Purchasers' conclusory allegations fail to

establish that their conduct had a "substantial effect" in the District of Columbia, Nevada, New

York, and Wisconsin.  (ECF No. 58-1 at PageID 301 (citing cases).)  In response, the Indirect

Purchasers argue that their Complaint alleges sufficient intrastate effects to satisfy the statutory

requirements of each state.  (ECF No. 71 at PageID 529-30.)  The Court agrees with the Indirect

Purchasers.

Defendants rely on In re Cast Iron Soil Pipe And Fittings Antitrust Litig., No. 1:14-md-

2508, 2015 WL 5166014, at *26 (E.D. Tenn. June 24, 2015), to argue that the conclusory nature

of the Indirect Purchasers' allegations compel their dismissal.  In In re Cast Iron, the court

dismissed the indirect plaintiffs' claims under the statutes of, inter alia, the District of Columbia,

Nevada, New York, and Wisconsin for their failure to address any connection between the

individual state and alleged wrongful conduct.  Id.  The court based that decision on the lack of

jurisdiction-specific allegations, as the plaintiffs only alleged, for instance, that "Defendants

engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and

commerce in violation of" the specific state statute.  Id.

Here, by contrast, while there are minimal jurisdiction-specific allegations, the Indirect

Purchasers do allege that their class includes people who paid Varsity for Cheer Apparel in each

of the states at issue.   (ECF No. 1 at PageID 10-11.)  Distinguishing In re Cast Iron on that basis,

and viewing that particular allegation as true and in a light most favorable to the Indirect

Purchasers, it is plausible that Defendants' anticompetitive conduct did have an effect, including

a potential substantial effect, on each jurisdiction.  Defendants' Motion is therefore **DENIED** as to the Indirect Purchasers' allegations under these state laws.

### 4.   Limited right to bring cause of action

Defendants also argue that the Indirect Purchasers cannot maintain private causes of action under the antitrust laws of Arkansas and Illinois.[20]  In response, the Indirect Purchasers argue that the statutory language of the state antitrust laws in Arkansas and Illinois permits their claims.  As explained below, the Court **DENIES** the Motion to Dismiss the Indirect Purchasers' claims under Arkansas law but **GRANTS** it as to their claim under Illinois law.

#### a.   Arkansas

As for Arkansas law, Webb argues that the Indirect Purchasers' claims fail because only the Attorney General may bring actions on behalf of an indirect purchaser under ARK Code Ann. § 4-75-309.  (ECF No. 58-1 at PageID 302.)  In response, the Indirect Purchasers argue that, even if the Arkansas antitrust law precludes claims of indirect purchasers, they may plead antitrust claims under the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. §§ 4-88-101, et seq. ("ADTPA").  (ECF No. 71 at PageID 532.)

The Indirect Purchasers correctly assert their ability to bring antitrust claims under the ADTPA.  See, e.g., In re Lithium Ion Batteries Antitrust Litig., No. 13-md-2420 YGR, 2014 WL 4955377, at *22 (N.D. Cal. Oct. 2, 2014) (finding that ADPTA's "catch-all" provision forbids "[e]ngaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade," which has included antitrust violations).  Further, even if they allege that defendants violated the Arkansas statute, not the ADTPA, in count 3, "[t]he failure in a

---

[20] Webb also argues that the Indirect Purchasers do not have a right of action under Utah law because they do not allege to be Utah citizens or residents, but Defendants' standing challenge under Utah law has already been considered and denied.  See supra Section III(B)(1) at p.44.

complaint to cite a statute, or to cite the correct one, in no way affects the merits of a claim." See Quinn–Hunt v. Bennett Enters., 122 Fed. App'x 205, 207 (6th Cir. 2005). "Factual allegations alone are what matters." Id.

In addition to their factual allegations under count 3, the Indirect Purchasers include factual allegations supporting a separate consumer protection claim under the ADTPA in count 4. (See ECF No. 1 at PageID 57.) However, the Court must construe all facts and inferences in favor of the Indirect Purchasers at this stage of the litigation, and concludes that Plaintiffs intended to plead different facts for separate liability under the statutes. Thus, the Court **DENIES** Defendants' Motion to Dismiss the Indirect Purchasers' claims under Arkansas law, construing them to be pleaded under the ADTPA.

### b.   Illinois

As for Illinois law, Defendants contend that, while Illinois' antitrust laws provide a private right of action for indirect purchasers, the state law only permits the Illinois attorney general to bring a class action on behalf of indirect purchasers under the statute. (ECF No. 58-1 at PageID 302 (citing 740 ILCS 10/7(2)).) The Indirect Purchasers respond by arguing that a state class action bar may limit them procedurally from seeking damages in state court, but it does not bar their ability to bring a class action entirely. (ECF No. 71 at PageID 532.)

"District courts are divided on whether the Illinois Antitrust Act precludes indirect purchasers from filing class actions [in federal court]." In re Effexor Antitrust Litig., 357 F. Supp. 3d 363, 391 (D.N.J. 2018). Compare, e.g., In re Opana Er Antritrust Litigation, 162 F. Supp. 3d 704, 723 (N.D. Ill. 2016) (dismissing with prejudice the indirect purchaser antitrust claims brought under Illinois law), with In re Broiler Chicken Antitrust Litig., 290 F. Supp. 3d 772, 817-18 (N.D. Ill. 2017) (refusing to dismiss "the Illinois antitrust claim on the basis of the

Illinois[ ] class action bar"). The conflict focuses on whether the Illinois restrictions on indirect purchaser actions are procedural or substantive.

If the class action ban is "procedural, not substantive," then "application of Rule 23 [of the Federal Rules of Civil Procedure, governing class actions in federal court] to them would not modify any substantive right." In re Lithium Ion Batteries Antitrust Litig., No. 13–MD–2420, 2014 WL 4955377, at *21 (N.D. Cal. Oct. 2, 2014). Thus, the class action would be permitted. If the class action bar is substantive in nature, it will apply and must be followed in federal court and preclude this claim. See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co., 559 U.S. 393, 408 (2010) (J. Stevens, concurring).

In Shady Grove, the Supreme Court addressed this issue by examining a conflict between a New York statute that precluded class actions seeking penalties or statutory damages and Rule 23. Id. First finding that the New York procedural statute "flatly contradict[ed]" Rule 23, the Court moved to an analysis of the nature of the law. Id. at 405. Justice Stevens, who wrote the Court's controlling concurrence,[21] stated that "[a] federal rule . . . cannot govern a particular case in which the rule would displace a state law that is procedural in the ordinary use of the term but is so intertwined with a state right or remedy that it functions to define the scope of the state-created right." Id. at 424 (Stevens, J., concurring). He concluded that, "[w]hen a federal rule appears to abridge, enlarge, or modify a substantive right, federal courts must consider whether the rule can reasonably be interpreted to avoid that impermissible result." Id. at 422-23. The New York law applied to all class claims brought in New York courts, including those based

---

[21] "If a state law collides with a federal rule, we must determine whether the federal rule applies . . . per Justice Stevens's controlling concurrence in [Shady Grove]." Albright v. Christensen, 24 F.4th 1039, 1044 (6th Cir. 2022).

on federal law or state law.  Thus, given its broad application, the Court found the law procedural

in form and function.  Id.

Relying on Shady Grove, the Indirect Purchasers urge that Rule 23 governs and their

claim is not precluded.  Defendants argue that other courts, in rejecting that argument, have held

that:

> The Illinois restrictions on indirect purchaser actions are intertwined with Illinois
> substantive rights and remedies because (1) the restrictions apply only to the IAA
> [Illinois Antitrust Act], (2) they are incorporated in the same statutory provision as the
> underlying right, not a separate procedural rule, and (3) the restrictions appear to reflect a
> policy judgment about managing the danger of duplicative recoveries. Because the
> indirect purchaser restrictions of the IAA are 'intertwined' with the underlying
> substantive right, application of Rule 23 would 'abridge, enlarge or modify' Illinois'
> substantive rights, and therefore Illinois' restrictions on indirect purchaser actions must be
> applied in federal court.

Staley v. Gilead Scis., Inc., 446 F. Supp. 3d 578, 624-25 (N.D. Cal. 2020) (citing In re

Wellbutrin XL Antitrust Litig., 756 F. Supp. 2d 670, 677 (E.D. Pa. 2010)).

The Court agrees with Defendants.  The Illinois class action bar is "so intertwined with a

state right or remedy that it functions to define the scope of the state-created right."  See Shady

Grove, 559 U.S. at 423 (Stevens, J., concurring).  Following Shady Grove, "courts have looked

to whether the state law in question applies to all claims, or whether its reach is limited to certain

claims, as an indication of whether it substantially impacts state substantive rights."  Phillips v.

Philip Morris Companies Inc., 290 F.R.D. 476, 481 (N.D. Ohio 2013).  Here, the state law's

reach is limited.  Indeed, the restriction itself is "not contained in a generally applicable

procedural rule but, rather, in the same paragraph of the same statute that creates the underlying

substantive right."  See In re Digital Music Antitrust Litig., 812 F.Supp. 2d 390, 416 (S.D.N.Y.

2011); In re Wellbutrin XL Antitrust Litig., 756 F.Supp.2d at 677; In re Auto. Parts Antitrust

Litig., No. 12-MD-02311, 2015 WL 13834708, at *4-5 (E.D. Mich. May 1, 2015).  The Illinois

state legislature created a private right of action to enforce the requirements of a state statute, and thus the state's definition of that private right of action provides the contours of the state-created right. In other words, it defines its scope. See Shady Grove, 559 U.S. at 423. Illinois' class action bar is therefore substantive. The Court therefore **GRANTS** Defendants' Motion to Dismiss the Indirect Purchasers' claim under Illinois law.

### c.  Conclusion

In conclusion, the Court **DENIES** Defendants' Motions to Dismiss Plaintiffs' claims under the antitrust laws of Tennessee, Arizona, Mississippi, South Dakota, West Virginia, the District of Columbia, Nevada, New York, Wisconsin, New York, and Arkansas, but **GRANTS** the Motions as to Plaintiffs' claims under the antitrust laws of Alaska, Colorado, Illinois, and Alabama, as well as the Tennessee claims related to the Cheer Camp and Cheer Competition markets.

### C.  Count 4: State Consumer Protection Law Claims

Webb, joined by Defendants USASF and Varsity Defendants, next challenges the sufficiency of the Indirect Purchasers' state consumer protection claims. The Indirect Purchasers' claims expressly track the allegations underlying the antitrust claims. The Court first addresses the scope of Defendants' challenge before turning to its merits.

### 1.  Scope

Webb argues that, "[b]ecause Plaintiffs' antitrust claims must be dismissed, so too must their state consumer protection claims that are based upon the same allegedly anticompetitive conduct." (ECF No. 58-1 at PageID 305.) This position leads to two conclusions. First, Webb does not challenge the consumer protection laws of California, Hawaii, Idaho, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Nebraska, New Hampshire, New Mexico, North

Dakota, Oregon, and Rhode Island.  Second, his argument implies that the consumer protection claims which are similar in nature to the antitrust claims that Webb challenged must also fail.

Webb is correct as to those consumer protection claims whose coordinating antitrust claims have been dismissed.  State consumer protection law claims fail when the antitrust claims based upon the same underlying conduct also fail.  See, e.g., Laughlin v. Evanston Hosp., 550 N.E.2d 986, 993 (1990) ("It would be inconsistent to provide that the very conduct which is not sufficient to state a cause of action under the Antitrust Act is sufficient to state a cause of action under the Consumer Fraud Act").  Because the Court granted Defendants' Motion as to the antitrust claims under Alaska, Colorado, Illinois, and Alabama law, it **GRANTS** the Motion as to the correlating consumer protection claims.  Thus, the following analysis concerns the consumer protection laws of the following states and jurisdictions: Tennessee, Arizona, Mississippi, South Dakota, West Virginia, the District of Columbia, Nevada, New York, Wisconsin, Utah, and Arkansas.

2.   Parties' Arguments

Webb and USASF argue that the Indirect Purchasers' consumer protection claims fail to satisfy the pleading requirements of Rule 8 of the Federal Rules of Civil Procedure, emphasizing a deficient "copy-and-paste" approach that fails to account for the differences among states' consumer protection laws.  (ECF No. 58-1 at PageID 303-04 (citing In re Aggrenox Antitrust Litig., 94 F. Supp. 3d 224, 255 (D. Conn. 2015)); ECF No. 57-1 at PageID 281.)  Webb and USASF contend that the allegations "are particularly deficient" because they fail to specify a particular Defendant in Count 4, but rather "use . . . the plural 'Defendants'" in two paragraphs.

(ECF No. 75 at PageID 598 (citing ECF No. 1 at ¶¶ 254-55); ECF No. 57-1 at PageID 266-67.)[22]
USASF also argues that Plaintiffs lack the ability to bring class actions under Tennessee[23] law,
contending that this law prohibits the Indirect Purchasers from bringing a class action.  (ECF No.
57-1 at PageID 281.)

   In response, the Indirect Purchasers contend that their claims are sufficiently pled
because the alleged anticompetitive scheme gives rise to both state antitrust claims as well as
consumer protection claims.  They assert that "many" state consumer protection statutes are
interpreted broadly to encompass unfair, unconscionable, or deceptive conduct, and that they
allege unlawful, non-hypothetical facts giving rise to these claims, including "unfair rebating
provisions, concealing the exclusionary agreements and thereby fraudulently concealing the
extent to the scheme, exploiting USASF to unfairly favor Varsity, and acts of unfair counter
programming."  (ECF No. 71 at PageID 535 (citing ECF No. 1 at ¶ 252).)  Additionally, the
Indirect Purchasers argue that their Fourth Claim for Relief [state law consumer protection
claims] is asserted against USASF "and other Defendants."  (ECF No. 69 at PageID 469.)

   Finally, the Indirect Purchasers do not respond to Defendant USASF's challenge to their
ability to bring a class action under Tennessee law.  The relevant statute provides that "[n]o class
action lawsuit may be brought to recover damages for an unfair or deceptive act or practice
declared to be unlawful by this part."  Tenn. Code Ann. § 47-18-109(g) (2020).  With the silent

---

[22] Webb also argues that the Indirect Purchasers fail to allege that Webb "himself offers products
or services," and thus that these claims should be dismissed as against him individually.  (ECF
No. 58-1 at PageID 304.)   However, as discussed supra at Sections I(B)(2) and II(A), the
Indirect Purchasers have sufficiently alleged that Webb can be held liable for actively
participating in Varsity's corporate actions under antitrust laws.

[23] USASF also challenges the provision under Colorado law, but, because the Indirect Purchasers
did not respond, the Court already granted the Motion to Dismiss that claim. See supra
Section III(B) at p.43.

concession by Plaintiffs, see 4th Leaf, 425 F. Supp. 3d at 823, the Court therefore **GRANTS**

Defendants' Motion to Dismiss the claim under Tennessee's consumer protection statute.  It

analyzes Defendants' other challenges below.

        3.  Analysis

A complaint that merely offers "a formulaic recitation of the elements of a cause of

action will not do."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  At the motion to

dismiss stage, courts have divergent approaches to the allegations of conclusory consumer

protection claims.  For instance, in Staley v. Gilead Scis., Inc., 446 F. Supp. 3d 578, 633-34

(N.D. Cal. 2020), a district court addressed a defendant's argument that the plaintiffs

"conclusorily" pled their consumer protection claims, provided no information as to how each

state's individual statutory requirements were satisfied, and "ignore[d] the differences among

state consumer-protection laws."  Id. at 633 (citing the defendant's filings).  The court denied the

defendant's motion, stating that, if the defendant "believes that specific elements of consumer

protection claims have not been met, that is their obligation to identify those specific elements."

Id. at 633-34.

In contrast, Defendants rely on In re Aluminum Warehousing Antitrust Litig., No. 13-

MD-2481 KBF, 2014 WL 4743425, at *1 (S.D.N.Y. Sept. 15, 2014), aff'd, 833 F.3d 151 (2d Cir.

2016), where the court granted the defendant's motion to dismiss consumer protection claims

because the plaintiffs "simply provide lists of state consumer protection statutes, without even

listing the elements of these statutes, let alone explaining how their factual allegations establish

valid claims for relief under them."  Id.  Notably, the court was concerned with insufficiently

pled allegations when "there is considerable variation in the elements of the state consumer

protection statutes under which plaintiffs seek relief."  Id.  However, the court dismissed these

claims based on, in part, the failure of the plaintiffs to allege proximate cause, a requirement of the state statutes at issue; Defendants do not raise that issue here.

Here, the Court finds the <u>Staley</u> court analysis persuasive and similarly finds that Defendants' "argument has no merit."  <u>See</u> <u>Staley</u>, 446 F. Supp. 3d at 633.  Webb does not specifically challenge any element of any individual consumer protection claim, and Plaintiffs pled the wrongdoing underlying their consumer protection claims, including "unfair rebating provisions, concealing the exclusionary agreements and thereby fraudulently concealing the extent to the scheme, exploiting USASF to unfairly favor Varsity, and acts of unfair counter-programming."  (ECF No. 71 at PageID 535 (citing ECF No. 1 at ¶ 252)); <u>see</u> <u>MacQuarie Grp. Ltd. v. Pac. Corporate Grp., LLC,</u> No. 08-cv-2113, 2009 WL 539928, at *9, 2009 U.S. Dist. LEXIS 16554 at *23-25 (S.D. Cal. Mar. 2, 2009) (recognizing that "courts routinely treat[ ] antitrust violations as deceptive acts").  Those allegations, taken as true at this stage, apply collectively to "Defendants," which, as stated previously, include Webb.  (<u>See</u> ECF No. 1 at PageID 4; <u>see also</u> <u>In re Effexor Antitrust Litig.,</u> 357 F. Supp. 3d 363, 398 (D.N.J. 2018) (denying motion to dismiss New York state consumer protection claims based on failure to allege particular conduct directed specifically at certain defendants because "[plaintiff's] claims focus on the anticompetitive conduct of Defendants, which . . . caused individuals to pay a premium.").)

Further, the Indirect Purchasers outline how Defendants' conduct violated the state consumer protection laws, including: (1) the full conduct engaged in by Defendants relative to the state laws in general and (2) that each of the state violations is "with respect to purchases of Defendants' products and services" in that jurisdiction by proposed class representatives and/or state residents.  (ECF No. 1 at PageID 57-59.)   While the Indirect Purchasers do not specify how

the elements of each statutory claim apply to their claims, Defendants are not left "to determine how and why the alleged conduct violated a particular statute." See In re Aluminum, 2014 WL 4277510, at *38.  The Indirect Purchasers state a claim for these consumer protection causes of action, thus Defendant's Motion is **DENIED**.

### D.  Count 5: State Unjust Enrichment

All Defendants[24] challenge the Indirect Purchasers' claim that Defendants have been unjustly enriched by their scheme to monopolize the relevant markets.  An unjust enrichment claim in Tennessee requires: (1) a benefit conferred by the plaintiff on the defendant; (2) the defendant's appreciation of the benefit; and (3) defendant's acceptance of the benefit under such circumstances that it would be inequitable for him to retain it without paying for its value. Freeman Indus., LLC v. Eastman Chemical Co., 172 S.W.3d 512, 525 (Tenn. 2005).  Defendants challenge the first and second factors.[25]  Based on the analysis below, the Court **DENIES** Defendants' Motion.

Defendants USASF and Webb argue that the Indirect Purchasers fail to allege that they conferred a benefit on either Defendant or that either Defendant "appreciated" that benefit.  (ECF Nos. 74, 58-1, 75.)  Instead, Defendant USASF contends that Plaintiffs' allegations confirm that "registration fees paid to USASF were actually payments to Varsity," and that USASF could not therefore be unjustly enrichment by these payments or otherwise.  (ECF No. 74 at PageID 585.)

---

[24] Defendant Varsity joins and incorporates the argument set forth by Defendant Webb challenging the Indirect Purchasers' state unjust enrichment claim.

[25] Defendants do not challenge the last factor of the unjust enrichment claim, save for Varsity Defendants' general argument that if the Indirect Purchasers fail to state a claim under the federal antitrust laws, they fail to state a claim under the principles of unjust enrichment.  (ECF No. 59 at PageID 325.)  Therefore, considering Plaintiffs' assertion that "[i]t would be wrong and inequitable for Varsity to be permitted to retain any of the illgotten gains from its wrongful monopolization scheme," (see ECF No. 1 at PageID 60), the Court finds this factor satisfied.

As for Webb, he argues that, although a benefit may be conferred indirectly, the Indirect

Purchasers still do not allege that Mr. Webb in particular retained any direct or indirect benefit

from them; to the contrary, "Varsity reaped any alleged benefit[,]" and retains that benefit.  (ECF

No. 58-1 at PageID 306; ECF No. 75.)

In response, the Indirect Purchasers argue that they are not required to allege specific

facts regarding the amount of benefit that Defendants received.  (ECF No. 69 at PageID 454

(citing ECF No. 1 at ¶¶ 260-61.)  Specifically as to Webb, the Indirect Purchasers emphasize that

his "position at Varsity, and the roles he played in effectuating major financial decisions for

Varsity as part of those positions, allowed him to obtain substantial benefits from the

anticompetitive scheme Plaintiffs allege."  (ECF No. 71 at PageID 538.)

The first factor of an unjust enrichment claim in Tennessee, that a benefit be conferred on

the defendant by the plaintiff, is a broad concept.  Freeman, 172 S.W.3d at 525.  "A benefit is

any form of advantage that has a measurable value including the advantage of being saved from

an expense or loss."  Id.  It need not be a direct benefit conferred upon the defendant, and may

involve benefits conferred on a defendant by third parties.  Id. (citing State ex rel. Palmer v.

Unisys Corp., 637 N.W.2d 142, 155 (Iowa 2001) (concluding that "benefits can be direct or

indirect, and can involve benefits conferred by third parties")).

In their Complaint, the Indirect Purchasers allege they conferred the economic benefit of

"profits stemming from anticompetitive charges" on "Defendants," defined earlier in the

Complaint to include USASF and Webb.  (ECF No. 1 at PageID 60.)  Thus, taking these

allegations as true, Plaintiffs satisfy the first factor of the analysis.  Even if Webb reaped his

benefits from the anticompetitive scheme by being paid by Varsity, that still qualifies as

involving benefits conferred by a third party onto Webb.

As to the second factor, a defendant must have "appreciat[ed]" the benefit.  <u>Freeman</u>, 172 S.W.3d at 525.  In other words, did USASF or Webb receive the benefit conferred by the Indirect Purchasers?  The Complaint alleges that Defendants "reaped and retained" the benefits "in the form of higher profits."  (ECF No. 1 at PageID 60; ECF No. 1 at PageID 4.)  Thus, on its face, the allegations satisfy this factor.  As to a benefit for Webb, it is plausible to infer from the Indirect Purchasers' allegations that he, as founder and Chairman of the Board of Directors of Varsity Brands, LLC, and Varsity's president, (ECF No. 1 at ¶ 20), indirectly received a benefit resulting from Varsity's profits.

As to USASF, the Indirect Purchasers allege that "the parents' fees to the All-Star Gyms and schools indirectly pay for . . . USASF registration fees," and that "Parents indirectly pay unlawfully inflated prices to Varsity for . . . registration fees for USASF."  (<u>Id</u>. at ¶ 75, 223.)  Taking these statements as true, and without objection from USASF as to this argument, the Court concludes that parents paid inflated prices for USASF registration fees.  Even if some of USASF's registration fees went directly from USASF to Varsity, whether Varsity retained <u>all</u> of the benefit of USASF's registration fees is a factual question.  Reading the Complaint in a light most favorable to the Indirect Purchasers, it is plausible that the USASF retained some benefit from the registration fees that they indirectly received from Plaintiffs, even if some of those fees went to Varsity.  Thus, the Court concludes that the Indirect Purchasers sufficiently plead the second element of this claim.

Thus, the Court finds that the Indirect Purchasers have satisfied all three factors of an unjust enrichment claim under Tennessee law at this stage and **DENIES** Defendants' Motions to Dismiss this alternative claim.

## IV.    Count 6: Declaratory Relief

The Indirect Purchasers seek a declaratory judgment that Defendants' conduct violates

§ 2 of the Sherman Act.  (ECF No. 1 at PageID 61.)  All Defendants argue that this relief would

be "superfluous" as it is duplicative of other substantive claims, and USASF argues that the

count does not apply to it.  (ECF No. 59-1 at PageID 341; ECF No. 58-1 at PageID 306; ECF

No. 57-1 at PageID 267.)  The Indirect Purchasers respond that the request is not duplicative, "as

a decree from the Court would control and clarify the proper standard for Varsity's <u>future</u>

business dealings and not merely resolve the Plaintiffs' past claims."  (ECF No. 68 at PageID

440 (citing <u>Dolgencorp, LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh Pennsylvania</u>, No. 3:18-

cv-0529, 2018 WL 3753157, at *2 (M.D. Tenn. Aug. 8, 2018)).)

"[D]istrict courts possess discretion in determining whether and when to entertain an

action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter

jurisdictional prerequisites."  <u>Wilton v. Seven Falls Co.</u>, 515 U.S. 277, 282 (1995).  The Sixth

Circuit applies a five-factor test to determine when a district court should exercise its non-

obligatory jurisdiction over a declaratory judgment:

> (1) whether the judgment would settle the controversy;
> (2) whether the declaratory judgment action would serve a useful purpose in clarifying the legal relations at issue;
> (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata";
> (4) whether the use of a declaratory action would increase the friction between our federal and state courts and improperly encroach on state jurisdiction; and
> (5) whether there is an alternative remedy that is better or more effective.

<u>AmSouth Bank v. Dale</u>, 386 F.3d 763, 784-85 (6th Cir. 2004) (citing <u>Scottsdale Ins. Co. v.</u>

<u>Roumph</u>, 211 F.3d 964, 967 (6th Cir. 2000)).

Here, a declaratory judgment would not settle the overall controversy between the

Parties, but there is no indication of its use merely for "procedural fending," and its use in this

litigation would not encroach on state jurisdiction.  Moreover, the declaratory judgment action would do nothing more than the substantive claims in clarifying the legal issues in dispute. However, while the Indirect Purchasers also seek other remedies in this matter, declaratory relief would control a standard for Varsity's future business dealings with individuals like the Indirect Purchasers.  Thus, exercising its "unique and substantial discretion," see Wilton, 515 U.S. at 286, the Court finds the declaratory judgment sought in this matter not duplicative or superfluous. Defendants' Motion to Dismiss this claim is therefore **DENIED**.

<u>**CONCLUSION**</u>

Based on the above analysis, the Court **DENIES** Defendants' Motions to Dismiss the Indirect Purchasers' claims for injunctive and declaratory relief under §§ 1, 2, and 3 of the Sherman Act.  As to the Motions to Dismiss state antitrust and consumer protection claims, the Court:

- **GRANTS** Defendants' Motion as to the Tennessee antitrust statute's applicability to the Cheer Camp and Cheer Competitions markets, but **DENIES** the Motion as to its applicability to the Cheer Apparel Market;
- **GRANTS** the Motion as to claims asserted under the state antitrust and consumer protection laws of Alaska, Colorado, Illinois, and Alabama, as well as the consumer protection laws of Tennessee;
- **DENIES** the Motion as to claims asserted under the state antitrust and consumer protection laws of Arizona, Arkansas, Mississippi, South Dakota, West Virginia, the District of Columbia, Nevada, New York, Wisconsin, and Utah; and
- **DENIES** the Motion on standing grounds.

Finally, the Court also **DENIES** the Motion to Dismiss the Indirect Purchasers' claims for unjust enrichment.

**IT IS SO ORDERED**, this 1st day of August, 2022.

s/ Sheryl H. Lipman
SHERYL H. LIPMAN
UNITED STATES DISTRICT JUDGE