IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| John Doe 3, | ) | |
| | ) | **C.A. No.  6:22-3510-HMH** |
| Plaintiff, | ) | |
| | ) | **OPINION & ORDER** |
| vs. | ) | |
| | ) | |
| Varsity Brands, LLC; Varsity Spirit, LLC; | ) | |
| Varsity Brands Holding Company, Inc.; | ) | |
| U.S. All Star Federation, Inc. d/b/a U.S. All | ) | |
| Star Federation; USA Federation for Sport | ) | |
| Cheering d/b/a USA Cheer; Charlesbank | ) | |
| Capital Partners, LP; Bain Capital, LP; Jeff | ) | |
| Webb, individually; Rockstar Cheer & | ) | |
| Dance, Inc.; Katherine Anne Foster, as the | ) | |
| personal representative of the Estate of | ) | |
| Scott Foster; Kathy Foster; Traevon Black | ) | |
| a/k/a Trey Black n/k/a Tracey Black; Jarred | ) | |
| Carruba; and other unknown defendants, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

Before the court is Defendant Jeff Webb's ("Webb") motion to dismiss Plaintiff's

complaint under Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6).  For the reasons below,

the court grants in part and denies in part Webb's motion.

## I. BACKGROUND

Plaintiff is a former youth cheerleader who alleges that he was sexually abused by

coaches employed by Defendant Rockstar Cheer & Dance, Inc. ("Rockstar Cheer"), a

cheerleading gym affiliated with the Varsity Defendants.[1]  In addition to pursuing claims against

---

[1]  The court refers to Defendants Varsity Brands, LLC ("Varsity Brands"), Varsity
Brands Holding Company, Inc. ("Varsity Holding"), and Varsity Spirit, LLC ("Varsity Spirit")
collectively as "Varsity" or the "Varsity Defendants."

the individual coaches and Rockstar Cheer, Plaintiff seeks to hold Varsity, Webb, Bain Capital, LP ("Bain"), Charlesbank Capital Partners, LP ("Charlesbank"), and competitive cheerleading's governing bodies – USA Federation for Sport Cheering ("USA Cheer") and U.S. All Star Federation ("USASF") – liable for misrepresenting the safety of Varsity gyms and competitions and failing to adopt and enforce adequate athlete-safety policies and procedures. The facts below are taken from Plaintiff's complaint and are accepted as true for purposes of the present motion. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).[2]

### A. Overview of All Star Cheerleading

Unlike traditional sideline cheerleading, All Star cheerleading is a competition-based sport unto itself. (Compl. ¶¶ 31-32, ECF No. 1.) All Star cheer teams compete by performing two-and-a-half minute routines set to music, which incorporate elements of tumbling, stunting, cheer, and dance. (Id. ¶ 31, ECF No. 1.) According to Plaintiff, over four million athletes across the United States participate in All Star cheerleading at some level, with many training and competing year-round. (Id. ¶¶ 33, 35, ECF No. 1.) This level of commitment is expensive: a single season costs anywhere from $3,000 to $7,000 per athlete, while some families spend more than $20,000 a year for transportation, lodging, membership fees, merchandise, and uniforms. (Id. ¶ 34, ECF No. 1.)

The beginnings of the competitive cheerleading industry can be traced to Webb's founding of the predecessor to Varsity Spirit in 1974. (Id. ¶ 41, ECF No. 1.) Varsity Spirit

---

[2] This case is one of four cases before the court involving similar allegations of sexual assault and essentially the same defendants. 6:22-cv-02957-HMH; 6:22-cv-03508-HMH; 6:22-cv-03509-HMH. Webb has moved to dismiss the other three cases as well. Those motions will be addressed in separate orders.

began as a provider of educational training camps for cheerleaders and has since expanded into selling uniforms and apparel and organizing cheer competitions. (Compl. ¶¶ 41-43, ECF No. 1.) It now controls an estimated 80-90% of the All Star cheer market. (Id. ¶ 45, ECF No. 1.) From 2014 to 2018, Varsity was wholly owned by Charlesbank, a Boston-based company. (Id. ¶¶ 27, 105, ECF No. 1.) Today, Varsity is owned by another Boston-based company – Bain – which purchased Varsity in 2018 for $2.8 billion.[3] (Id. ¶¶ 28, 107, ECF No. 1.)

Two governing bodies oversee competitive cheerleading in the United States: USASF and USA Cheer. (Id. ¶¶ 26, 80, 84, 86, ECF No. 1.) Plaintiff maintains that Varsity was heavily involved in creating and operating both organizations. For example, Varsity allegedly advanced a $1.8 million interest-free loan to help launch USASF, submitted USASF's trademark application, and for at least fifteen years, housed USASF's offices at its corporate address and paid USASF's employees directly. (Compl. ¶¶ 79, 88-90, ECF No. 1.) Varsity also continues to control a majority of the seats on USASF's board of directors, including all seats with voting rights. (Id. ¶ 91, ECF No. 1.) Similar to USASF, USA Cheer was purportedly created in 2007 with the help of an interest-free loan from Varsity, listed "Varsity's Tennessee headquarters as its own," and at one time had six Varsity employees on its board. (Id. ¶¶ 84-85, 94, ECF No. 1.)

As a result of Webb's and Varsity's ties to cheerleading's governing bodies, Plaintiff contends, Webb and Varsity "were entirely self-regulated" and could control "all aspects of All-Star cheer." (Id. ¶¶ 77, 99, ECF No. 1.) As examples, Plaintiff points out that:

- All Star athletes must buy a USASF membership to compete at Varsity events. (Id. ¶ 48, ECF No. 1.)

---

[3] At the same time, Plaintiff alleges that "Charlesbank made a new investment in Varsity alongside . . . Bain and retained a minority stake in the business." (Compl. ¶ 107, ECF No. 1.)

- All Star athletes are required to pay annual or monthly dues to Varsity and their local Varsity-affiliated gym for "competition attendance, uniforms, accessories, and other related fees." (Compl. ¶ 53, ECF No. 1.)

- "Gyms and coaches likewise pay monthly or annual fees to USASF, USA Cheer and the Varsity Defendants." (Id. ¶ 54, ECF No. 1.)

- Affiliate gyms are required "to sign multi-year supply contracts whereby the gyms are paid cash rebates from Varsity Spirit, LLC for buying [its] merchandise and for sending athletes to Varsity events." (Id. ¶ 51, ECF No. 1.)

- "[M]embership in USASF[] and with a Varsity-affiliated gym mandates competing in a specified number of annual [V]arsity events." (Id. ¶ 58, ECF No. 1.)

- Athletes and their families must purchase rooms at Varsity-selected hotels while at Varsity competitions; the failure to do so "subjects the athlete to disqualification." (Id. ¶ 60, ECF No. 1.)

### B. Scott Foster and the Rockstar Cheer Gym

Defendant Scott Foster cheered collegiately at the University of Louisville, "a pre-eminent [sic] name in the world of competitive cheerleading," and began coaching youth cheerleaders in Kentucky in 1996. (Compl. ¶¶ 169-70, ECF No. 1.) Shortly after moving to Greenville, South Carolina, in 1999, Scott Foster opened an All Star cheer gym together with his wife, Defendant Kathy Foster. (Id. ¶ 172, ECF No. 1.) The couple at one point also operated World Spirit Federation, a competition cheerleading company, before selling the company to Varsity Brands in 2006. (Id. ¶ 173, ECF No. 1.) A year later, in 2007, Scott and Kathy Foster opened Rockstar Cheer in Greenville. (Id. ¶ 174, ECF No. 1.) Rockstar Cheer's stated mission was "[t]o provide a structured environment of competitive cheerleading while accomplishing our goals [and] to teach dedication, commitment, self-confidence, teamwork, discipline, responsibility, and leadership in a family-friendly, safe and fun environment." (Id. ¶ 175, ECF No. 1.) To this end, USASF certified Rockstar Cheer "as meeting All-Star standards with

4

respect to coach credentials, program quality, and athlete safety." (Compl. ¶ 176, ECF No. 1.)
According to Plaintiff, this meant that USASF "warrant[ed] that [Rockstar Cheer], its coaches,
and its choreographers were safe[] and followed best practices . . . to prevent athlete abuse." (Id.
¶ 50, ECF No. 1.)

    In 2018, one of Rockstar Cheer's teams, Beatles, won Varsity's World Championship
title. (Id. ¶ 179, ECF No. 1.)  This accomplishment "further elevated Rockstar's status" and
allowed Scott and Kathy Foster "to recruit athletes nationwide." (Id. ¶¶ 178-79, ECF No. 1.)

### C. Plaintiff's Allegations of Abuse

    John Doe 3 began cheering for Rockstar Cheer in 2014 when he was 15 years old. (Id.
¶ 209, ECF No. 1.)  It was around this time that he met Defendant Traevon Black a/k/a Trey
Black n/k/a Tracey Black ("Black"), a 20-year-old Rockstar Cheer coach. (Compl. ¶ 212, ECF
No. 1.)  John Doe 3 alleges that Black engaged in sexual intercourse with him on numerous
occasions between 2014 and 2015. (Id. ¶ 213, ECF No. 1.)  John Doe 3 contends that the sexual
conduct between him and Black was "well known" among coaches and staff at Rockstar Cheer.
(Id. ¶ 215, ECF No. 1.)  John Doe 3 also claims that another Rockstar Cheer coach – Defendant
Jarred Carruba ("Carruba") – sent him sexually explicit messages and photographs on Snapchat
during this time. (Id. ¶ 216, ECF No. 1.)  According to John Doe 3, both Black and Carruba
knew that he was only 15 years old. (Id. ¶¶ 214, 217, ECF No. 1.)  In addition, the complaint
accuses Scott Foster of providing John Doe 3 with alcohol, cigarettes, and cocaine. (Compl.
¶¶ 218-19, ECF No. 1.)  Since leaving Rockstar Cheer, "John Doe 3 has participated in sexual
abuse therapy to cope with the trauma associated with the years of abuse" by Black. (Id. ¶ 220,
ECF No. 1.)

### D. Procedural History

Plaintiff filed his complaint on October 11, 2022. Against Webb, he asserts statutory claims under the Child Abuse Victims' Rights Act of 1986 ("CAVRA"), 18 U.S.C. § 2255, and the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d), along with common-law claims for gross negligence and civil conspiracy. (Compl., ECF No. 1.) On December 19, 2022, Webb moved to dismiss Plaintiff's complaint for lack of personal jurisdiction under Rule 12(b)(2) and failure to state a claim under Rule 12(b)(6). (Webb Mot. Dismiss, ECF No. 38.) Plaintiff filed a response on January 18, 2023. (Resp. Opp'n Webb Mot. Dismiss, ECF No. 62.) Webb then replied on February 2, 2023.[4] (Webb Reply, ECF No. 69.) This matter is now ripe for decision.[5]

## II. LEGAL STANDARDS

### A. Rule 12(b)(2)

Federal Rule of Civil Procedure 12(b)(2) allows a defendant to move to dismiss a complaint for lack of personal jurisdiction. "Where, as here, the . . . court decides jurisdiction on the motion papers alone, the plaintiff need only make a 'prima facie showing of a sufficient jurisdictional basis' to prevail." Perdue Foods LLC v. BRF S.A., 814 F.3d 185, 188 (4th Cir. 2016) (quoting Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989)). In deciding whether the

---

[4] On March 1, 2023, Plaintiffs in the 6:22-2957 case filed a motion before the United States Judicial Panel on Multidistrict Litigation seeking to transfer all related, pending civil actions filed in districts throughout the United States. See Motion to Transfer, In re Varsity Spirit Athlete Abuse Litig., MDL No. 3077, ECF No. 1. The motion to transfer was denied on June 5, 2023. In re Varsity Spirit Athlete Abuse Litig., MDL No. 3077, 2023 WL 3828645 (J.P.M.L. June 5, 2023).

[5] Under Local Rule of Civil Procedure 7.08, the court may decide motions without a hearing.

plaintiff has made such showing, "the court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." Combs, 886 F.2d at 676. The court will not, however, "credit conclusory allegations or draw farfetched inferences." Sonoco Prods. Co. v. ACE INA Ins., 877 F. Supp. 2d 398, 405 (D.S.C. 2012) (quoting Masselli & Lane, PC v. Miller & Schuh, PA, No. 99-2440, 2000 WL 691100, at *1 (4th Cir. 2000) (unpublished)).

### B. Rule 12(b)(6)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). This plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). "'[D]etailed factual allegations'" are not required, but the plaintiff must present "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. (quoting Twombly, 550 U.S. at 555). In reviewing the complaint, the court "must accept the factual allegations of the complaint as true and construe them in the light most favorable to the nonmoving party." Rockville Cars, LLC v. City of Rockville, 891 F.3d 141, 145 (4th Cir. 2018).

### III. DISCUSSION

The court begins with Webb's personal jurisdiction arguments under Rule 12(b)(2). Ruhrgas AG v. Marathon Oil, Inc., 526 U.S. 574, 583 (1999) ("Personal jurisdiction . . . is 'an essential element of the jurisdiction of a district . . . court,' without which the court is 'powerless

to proceed to an adjudication.'" (quoting <u>Employers Reinsurance Corp. v. Bryant</u>, 299 U.S. 374, 382 (1937))).

There are two ways Plaintiff can establish personal jurisdiction over Webb: "(1) the nationwide service of process provisions of [RICO or the CAVRA] and then pendent personal jurisdiction over the state causes of action or (2) by a traditional minimum contacts and due process analysis for all causes of action." <u>Sadighi v. Daghighfekr</u>, 36 F. Supp. 2d 267, 271 (D.S.C. 1999). The court considers the former route first.

**A. Whether the Court Has Personal Jurisdiction Over Webb Under RICO or the CAVRA**

Under Federal Rule of Civil Procedure 4(k)(1)(C), "[s]erving a summons or filing a waiver of service establishes personal jurisdiction over a defendant . . . when authorized by a federal statute." Both RICO and the CAVRA authorize nationwide service of process. RICO's nationwide-service-of-process provision, 18 U.S.C. § 1965(d), provides that process "may be served on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs." To similar effect, the CAVRA allows for service of process on a defendant in an action brought under 18 U.S.C. § 2255 "in any district in which the defendant . . . is an inhabitant [or] may be found." <u>Id.</u> § 2255(c)(2); <u>see also</u> <u>Ramsbottom v. Ashton</u>, No. 3:21-CV-00272, 2022 WL 106733, at *13 (M.D. Tenn. Jan. 11, 2022) (unpublished) ("Numerous courts . . . have concluded that identical language for service of process in any district in which the defendant either 'is an inhabitant' or 'may be found' 'authorizes nationwide service of process' and, thus, also provides 'the statutory basis for personal jurisdiction.'" (quoting <u>Peay v. BellSouth Med. Assistance Plan</u>, 205 F.3d 1206,

8

1210 (10th Cir. 2000) (finding "no question" that identical language in 29 U.S.C. § 1132(e)(2) authorizes nationwide services of process in ERISA case))).

When a plaintiff relies on a federal statute providing for nationwide service of process, the court will have personal jurisdiction over a properly served defendant provided that (1) the federal claim is colorable and (2) the exercise of personal jurisdiction satisfies the Fifth Amendment's Due Process Clause. See ESAB Grp., Inc. v. Centricut, Inc., 126 F.3d 617, 627-29 (4th Cir. 1997); Nunes v. Fusion GPS, 531 F. Supp. 3d 993, 1003-04 (E.D. Va. 2021). Both requirements are met in this case.

As for the first requirement, Plaintiff's RICO and CAVRA claims against Webb are "at least arguable and nonfrivolous." D'Addario v. Geller, 264 F. Supp. 2d 367, 389 (E.D. Va. 2003) (emphasis removed). In other words, the claims are not "wholly immaterial or insubstantial so as to deprive Plaintiff of [his] right to rely on RICO's [and the CAVRA's] nationwide-service-of-process provision[s]." Fusion GPS, 531 F. Supp. 3d at 1004 (internal quotation marks omitted); Republic of Pan. v. BCCI Holdings (Lux.) S.A., 119 F.3d 935, 941 (11th Cir. 1997) ("When a jurisdictional motion to dismiss depends . . . on the assertion of a right created by a federal statute, the court should dismiss for lack of jurisdiction only if the right claimed is so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise devoid of merit as not to involve a federal controversy." (internal quotation marks omitted)). The court emphasizes the limited scope of this holding, however, as whether a federal claim is colorable for jurisdictional purposes is a distinct question from whether the claim is plausible for Rule 12(b)(6) purposes. Fusion GPS, 531 F. Supp. 3d at 1004; In re Takata Airbag Prods. Liab. Litig., 396 F. Supp. 3d 1101, 1144 (S.D. Fla. 2019); cf. Davis v. Featherstone, 97 F.3d 734,

737-38 (4th Cir. 1996) (stating, in the ERISA context, that "[a] claim is colorable if it is arguable and nonfrivolous, whether or not it would succeed on the merits").

As for the second requirement, Webb has sufficient contacts with the United States as a whole such that the court's exercise of personal jurisdiction would not violate the Fifth Amendment. To start, the nationwide minimum-contacts component is satisfied, as Webb is domiciled in Tennessee. United States ex rel. Fadlalla v. DynCorp. Int'l LLC, 402 F. Supp. 3d 162, 177 (D. Md. 2019) ("[W]here . . . a federal statute authorizes nationwide service of process, a national contacts standard applies." (internal quotation marks omitted)); Republic of Pan., 119 F.3d at 946-47 (explaining that a Fifth Amendment due-process analysis considers "a defendant's aggregate contacts with the nation as a whole rather than his contacts with the forum state"). Further, Webb has not met the "heavy burden" of showing that the "assertion of personal jurisdiction over [him] would result in 'such extreme inconvenience or unfairness as would outweigh the congressionally articulated policy' evidenced by a nationwide service of process provision." Denny's, Inc. v. Cake, 364 F.3d 521, 524 n.2 (4th Cir. 2004) (quoting ESAB, 126 F.3d at 627). Although there may be times "in which a defendant [has] sufficient contacts with the United States as a whole but still will be unduly burdened by the assertion of jurisdiction in a faraway and inconvenient forum," such is not the case here. Republic of Pan., 119 F.3d at 947.

In sum, because Plaintiff's RICO and CAVRA claims are colorable, and litigating this case in South Carolina poses no constitutionally significant inconvenience to Webb, the court has personal jurisdiction over Webb as to Plaintiff's RICO and CAVRA claims asserted against him. The court may also exercise personal jurisdiction over the remaining state claims against

Webb under the doctrine of pendent-claim personal jurisdiction, as Plaintiff's "federal and state claims arise from a common nucleus of operative fact." ESAB, 126 F.3d at 628 ("When a federal statute authorizes a federal district court to exercise personal jurisdiction over a defendant beyond the borders of the district and the defendant is effectively brought before the court, [there is] little reason not to authorize the court to adjudicate a state claim properly within the court's subject matter jurisdiction so long as the facts of the federal and state claims arise from a common nucleus of operative fact."). With that said, because the court's exercise of pendent-claim personal jurisdiction over Plaintiff's state claims hinges on the viability of his federal "anchor" claims, see Geller, June 25, 2023 264 F. Supp. 2d at 387-88, the court next turns to Webb's Rule 12(b)(6) challenges to Plaintiff's CAVRA and RICO claims.

### B. Whether Plaintiff Has Stated a Plausible CAVRA or RICO Claim

### 1. CAVRA Claim Under 18 U.S.C. § 2255 (Count I)

Congress enacted § 2255 as part of the CAVRA to address the "multi-million dollar" child exploitation industry and the "lack [of] effective remedies" available to "exploitation victims" "under Federal law." Pub. L. No. 99-500, § 702, 100 Stat. 1783, 1783-74 (1986). Section 2255 empowers victims of certain felonies related to sex trafficking, sexual abuse, and the distribution of child pornography to recover damages for the harms caused by their abusers. The statute reads:

> Any person who, while a minor, was a victim of a violation of section 1589, 1590, 1591, 2241(c), 2242, 2243, 2251, 2251A, 2252, 2252A, 2260, 2421, 2422, or 2423 of this title and who suffers personal injury as a result of such violation . . . may sue in any appropriate United States District Court and shall recover the actual damages such person sustains or liquidated damages in the amount of $150,000, and the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred. The court may also award punitive damages and such other preliminary and equitable relief as the court determines to be appropriate.

11

18 U.S.C. § 2255(a).  No criminal conviction is necessary to recover damages.  Prewett v. Weems, 749 F.3d 454, 458 (6th Cir. 2014) (reaching this conclusion after considering the plain meaning of the term "violation," distinct uses of "violation" and "conviction" in neighboring statutes, and civil RICO's violation requirement).  Rather, a plaintiff need only show that the defendant committed one of the enumerated offenses by a preponderance of the evidence.  Id.; Smith v. Husband, 376 F. Supp. 2d 603, 613 (E.D. Va. 2005); Doe v. Liberatore, 478 F. Supp. 2d 742, 755 (M.D. Pa. 2007).

> The complaint alleges that John Doe 3
>
> was a minor at the time he was sexually abused and assaulted, sexually exploited, transported across state lines for illegal sexual activity, and/or used in creating or receiving illegal and obscene digital materials in contravention of *18 U.S.C. §§ 2241(c), 2242, 2243, 2251, 2251A, 2252, 2252A, 2260, 2421, 2422, and 2223*, thus constituting violations of 18 U.S.C. §2255.

(Compl. ¶ 230, ECF No. 1) (emphasis added).  Plaintiff claims that these acts were "enabled by the ongoing certification and ratification" of Varsity, USASF, USA Cheer, Bain, and Charlesbank since Rockstar Cheer was "held out" by those Defendants "as being part of a network of safe and trustworthy cheer coaching gyms."  (Id. ¶¶ 225, 229, ECF No. 1.)  As explained below, however, Plaintiff has not stated a plausible claim for relief against Webb under § 2255.

To begin, notably absent from Plaintiff's response to Webb's motion to dismiss is any discussion of the eleven predicate offenses cited in the complaint.  Plaintiff instead spends several pages discussing only 18 U.S.C. §§ 1589 (forced labor) and 1591 (sex trafficking) – statutes that he did not allege in his complaint.  The court cannot consider claims raised for the first time in a response to a motion to dismiss.  2 James Wm. Moore, Moore's Federal Practice

§ 12.34[2] (3d ed. 2022); Mylan Labs., Inc. v. Akzo, N.V., 770 F. Supp. 1053, 1068 (D. Md. 1991) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." (quoting Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1107 (7th Cir. 1984))); Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc., 836 F.2d 173, 181 (3d Cir.1988) ("[L]egal theories set forth in [a] brief are helpful only to the extent that they find support in the allegations set forth in the complaint."). To hold otherwise would effectively allow a party to circumvent the amendment requirements of Rule 15(a).[6] See Morgan Distrib. Co. v. Unidynamic Corp., 868 F.2d 992, 995 (8th Cir. 1989).

In any event, Plaintiff's § 2255 claim fails on the merits for three reasons. First, Plaintiff has not pled specific facts suggesting that Webb personally committed any of the predicate offenses alleged in the complaint. (Compl. ¶¶ 209-222, ECF No. 1) (detailing allegations of abuse committed by Defendants Black and Carruba); Upton v. Vicknair, No. 21-407, 2021 WL 2635460, at *5 (E.D. La. June 25, 2021) (unpublished) ("[A] claim under § 2255 is limited to a defendant [who] committed the acts described in any of the listed offenses. Because Plaintiff does not allege that the City Defendants violated any of the enumerated statutes, this claim will be dismissed." (internal quotation marks and citation omitted)).

Second, to the extent Plaintiff is relying on a vicarious liability theory, that claim fails because the complaint does not plausibly allege that Plaintiff's abusers were agents of Webb. Although § 2255 does not address vicarious liability, the court must assume that "when Congress creates a tort action, it legislates against a legal background of ordinary tort-related

---

[6] Even if the court were to consider the new grounds for relief that Plaintiff raises in his response brief, Plaintiff has not sufficiently alleged how Webb violated § 1589(b) or § 1591(a)(2).

vicarious liability rules and consequently intends its legislation to incorporate those rules."
Meyer v. Holley, 537 U.S. 280, 285 (2003); United States v. Texas, 507 U.S. 529, 534 (1993)
("In order to abrogate a common-law principle, the statute must speak directly to the question
addressed by the common law." (internal quotation marks omitted)).  This theory of liability
thus requires allegations suggesting an agency relationship between John Doe 3's alleged
abusers and Webb.  Meyer, 537 U.S. at 285 ("[T]raditional vicarious liability rules ordinarily
make principals or employers vicariously liable for acts of their agents or employees in the scope
of their authority or employment.").  More specifically, it requires facts that Webb both had the
right to control Black and Carruba and consented to them acting on his behalf.  Id. at 286;
Restatement (Second) of Agency § 1 (Am. L. Inst. 1958) (stating that an agency relationship is
created when one person agrees with another "that the other shall act on his behalf and subject to
his control").

The court's review of the complaint reveals that Plaintiff has pled no such facts.  The
complaint merely alleges that Black and Carruba were employed by a private All Star gym that
contracted with Varsity to buy Varsity apparel and send its athletes to Varsity competitions.
(Compl. ¶¶ 16, 17, 51, 58, 168, ECF No. 1.)  Nowhere, though, does the complaint allege that
there was express or implicit agreement that the coaches would act on Webb's behalf and
subject to his control.  See Restatement (Second) of Agency § cmt. a (Am. L. Inst. 1958) ("The
principal must in some manner indicate that the agent is to act for him, and the agent must act or
agree to act on the principal's behalf and subject to his control.").  Plaintiff's failure to
adequately allege an agency relationship is fatal to his attempt to hold Webb liable for the
alleged predicate offenses committed by his abusers.

Finally, to the extent Plaintiff seeks to hold Webb secondarily liable under an aiding-and-abetting theory, a plain reading of § 2255 and Supreme Court case law foreclose that argument.[7]

When interpreting a statute, the court begins, as always, with the statute's text.  United States v. Bryant, 949 F.3d 168, 174 (4th Cir. 2020).  The court "must presume that [Congress] says in a statute what it means and means in a statute what it says."  Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992).  "When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete."  Id. at 254 (internal quotation marks omitted).  Section 2255 makes no mention of secondary liability, which "by itself is an indication that Congress did not intend to permit such a theory."  Doe v. City of Gauley Bridge, No. 2:21-cv-00491, 2022 WL 3587827, at *13 (S.D. W. Va. Aug. 22, 2022) (unpublished); Boim v. Holy Land Found. for Relief & Dev., 549 F.3d 685, 689 (7th Cir. 2008) (en banc) (Posner, J.) ("[S]tatutory silence on the subject of secondary liability means there is none.").

To be sure, the court recognizes that a few other courts have read secondary liability into § 2255.  See Liberatore, 478 F. Supp. 2d at 756-57; Doe v. Schneider, No. 08-3805, 2013 WL 5429229, at *10 (E.D. Pa. Sept. 30, 2013) (unpublished) (following Liberatore); M.A. ex rel. P.K. v. Village Voice Media Holdings, LLC, 809 F. Supp. 2d 1041, 1053-54 (E.D. Mo. 2011)

---

[7]  The federal aiding-and-abetting statute provides that "[w]hoever . . . aids, abets, counsels, commands, induces or procures [the commission of an offense against the United States] is punishable as a principal."  18 U.S.C. § 2(a).  Unlike vicarious liability – which allows a defendant to be held liable for the bad acts of another simply because of the defendant's relationship with the wrongdoer, Restatement (Second) of Agency § 219 (Am. L. Inst. 1958) – aiding-and-abetting liability holds a defendant responsible for his own acts in helping the wrongdoer,  Rosemond v. United States, 572 U.S. 65, 71 (2014) ("[A] person is liable under § 2 for aiding and abetting a crime if (and only if) he (1) takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission.").

(same).  In doing so, however, those courts overlooked the Supreme Court's decision in Central Bank, N.A. v. First Interstate Bank, N.A., 511 U.S. 164 (1994).  Central Bank concerned whether a private cause of action extends to suits against aiders and abettors of securities fraud under § 10(b) of the Securities and Exchange Act of 1934.  511 U.S. at 167.  The Court answered that question in the negative, reasoning that "Congress kn[ows] how to impose aiding and abetting liability when it cho[oses] to do so.  If . . . Congress intended to impose aiding and abetting liability, we presume it would have used the words 'aid' and 'abet' in the statutory text. But it did not."  Id. at 176-77 (internal citations omitted).  The Court went on to explain that because "Congress has not enacted a general civil aiding and abetting statute," "there is no general presumption that [a] plaintiff may also sue aiders and abettors" when Congress creates a private cause of action.  Id. at 182.

Central Bank's rationale is not limited to the context of federal securities laws, as "nothing in its holding turns on particular features of those laws."  Boim, 549 F.3d at 689; see also Owens v. BNP Paribas, S.A., 897 F.3d 266, 277-78 (D.C. Cir. 2018) (relying on Central Bank in holding that the pre-Justice Against Sponsors of Terrorism Act version of 18 U.S.C. § 2333 does not permit aiding-and-abetting liability); Freeman v. DirecTV, Inc., 457 F.3d 1001, 1006 & n.1 (9th Cir. 2006) (relying on Central Bank in holding that §§ 2702 and 2707 of the Electronic Communications Privacy Act do not allow for secondary liability).  As a result, the court finds the reasoning of Central Bank controlling and declines to read secondary liability into § 2255.

Based on the above, Plaintiff has failed to state a § 2255 claim against Webb.  The court therefore grants Webb's motion to dismiss Count I.

**2. RICO Claims Under 18 U.S.C. § 1962(c), (d) (Count II)**

18 U.S.C. § 1964 provides a civil cause of action for "[a]ny person injured in his business or property by reason of a violation" of RICO's substantive provisions found in § 1962. Section 1962(c), in turn, prohibits "any person employed by or associated with any enterprise" that engages in interstate commerce from "conduct[ing] or participat[ing], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." To state a claim under § 1962(c), then, a plaintiff must allege that the defendant (1) conducted (2) an enterprise (3) through a pattern (4) of racketeering activity, Sedima, S.P.R.L. v. Imrex, Co., 473 U.S. 479, 496 (1985), and that the plaintiff suffered injury to "business or property" as a result, Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc., 262 F.3d 260, 264 (4th Cir. 2001). RICO's conspiracy provision, § 1962(d), makes it "unlawful for any person to conspire to violate any of the provisions" of § 1962, including § 1962(c).

Webb challenges nearly every aspect of Plaintiff's RICO claims under §§ 1962(c) and (d). As explained below, the court finds that Plaintiff has not plausibly alleged (1) RICO standing, (2) the existence of an association-in-fact enterprise, (3) that Webb engaged in any racketeering activity, let a lone a pattern of such activity, or (4) that he conspired to commit a RICO violation.

**a. RICO Standing**

RICO's standing requirement has two elements: injury to "business or property" and causation. Brandenburg v. Seidel, 859 F.2d 1179, 1187 (4th Cir. 1988).

To begin, Webb correctly notes – and Plaintiff does not appear to challenge – that any personal injuries Plaintiff may have suffered as a result of the alleged abuse cannot confer RICO

standing.  Bast v. Cohen, Dunn & Sinclair, P.C., 59 F.3d 492, 496 (4th Cir. 1995)

("[A]llegation[s] of personal injury and pecuniary losses occurring therefrom are not sufficient

to meet the statutory requirement of injury to 'business or property.'").  Plaintiff, for his part,

argues that his lost ability to cheer competitively and the dues and fees he paid Varsity and

USASF are sufficient to satisfy RICO's standing requirement.  The court will discuss the

sufficiency of these alleged harms in turn.

### i. Lost Ability to Cheer Competitively

Plaintiff contends that he had an identifiable property interest in the "continued ability to

cheer competitively," which would have allowed him to achieve and monetize social media

fame, earn an athletic scholarship, and perhaps one day become a cheer coach, gym owner, or

event promoter himself.  (RICO Case Statement 48, ECF No. 17.)  This argument lacks merit for

two reasons.  First, any injuries that Plaintiff might suffer from having his competitive

cheerleading career cut short are too speculative to constitute injury to business or property

within the meaning of § 1964(c).  See Price v. Pinnacle Brands, 138 F.3d 602, 607 (5th Cir.

1998) ("Injury to mere expectancy interests or to an intangible property interest is not sufficient

to confer RICO standing." (internal quotation marks omitted)).  Plaintiff had, at best, mere

expectancy interests in realizing the future financial and business opportunities described in his

RICO case statement.  (RICO Case Statement 48, ECF No. 17); see, e.g., Bowen v. Adidas Am.,

Inc., 541 F. Supp. 3d 670, 679-80 (D.S.C. 2021) (holding that a former college basketball player

had an "unrecoverable expectancy interest . . . . in the supposed lost professional earnings he

hoped to obtain as a first-round NBA draft pick"); Strates Shows, Inc. v. Amusements of Am.,

Inc., 379 F. Supp. 2d 817, 827-28 (E.D.N.C. 2005) (finding that plaintiff lacked a property

18

interest in the expectation of a contract even though plaintiff had been awarded the contract "as a matter of course in past years"); In re Taxable Mun. Bond Sec. Litig., 51 F.3d 518, 523 (5th Cir. 1995) ("Anderson's suit shows only a lost opportunity to obtain a . . . loan.  Such lost opportunity by itself does not constitute an injury that confers standing to bring a RICO cause of action.").

Second, even if Plaintiff had incurred concrete losses from being unable to continue cheerleading, those losses could not confer RICO standing as they would be derivative of non-compensable personal injuries – that is, those stemming from the alleged sexual abuse Plaintiff suffered.  RICO's "injury to business or property" requirement excludes from its reach not only personal injuries, but also "pecuniary losses occurring therefrom."  Bast, 59 F.3d at 495; Doe v. Roe, 958 F.2d 763, 768-70 (7th Cir. 1992) (miscellaneous expenses flowing from mental distress caused by arrangement in which plaintiff was coerced into paying for legal fees with sexual services not actionable under RICO); Grogan v. Platt, 835 F.2d 844, 848 (11th Cir. 1988) (economic damages, including loss of income, resulting from murder not actionable).

For these reasons, Plaintiff cannot state a RICO claim based on any damages resulting from his lost ability to compete in competitive cheerleading.

### ii. Membership Dues and Fees

Next, Plaintiff claims that he has RICO standing based on the "membership dues, fees, and other incidental costs he paid to Defendants."  (RICO Case Statement 48, ECF No. 17.)

Although money undeniably is "a form of property," Reiter v. Sonotone Corp., 442 U.S. 330, 338 (1979), Webb argues that the sums Plaintiff paid to become a member of USASF and compete in Varsity competitions also derive from his personal injuries.  That argument is

unavailing, however, as Plaintiff paid his dues and fees *before* he suffered abuse, not the other way around. Thus, the dues and fees Plaintiff paid to USASF and Varsity cannot be said to derive from his non-compensable personal injuries.

Suffering injury to one's business or property, though, is only half of the RICO standing equation. Plaintiff must also show that Defendants' predicate acts were both the but-for and proximate cause of his alleged injury. Hemi Grp., LLC v. City of New York, N.Y., 559 U.S. 1, 9 (2010). Webb contends that Plaintiff cannot show causation, citing Gilbert v. U.S. Olympic Comm., No. 18-cv-00981-CMA-MEH, 2019 WL 1058194 (D. Colo. Mar. 6, 2019) (unpublished), Report and Recommendation adopted in relevant part by 423 F. Supp. 3d 1112 (D. Colo. 2019). The plaintiffs in Gilbert were female taekwondo athletes who allegedly suffered sexual abuse while competing in the USA Taekwondo ("USAT") system. Id. at *1. In support of their RICO claim, the plaintiffs argued that they had RICO standing based in part on the $50 annual membership fee they each paid the USAT. Id. at *24. The court rejected that argument, reasoning that "Plaintiffs paid $50 in dues to be members of USAT" and "participate in USAT-sanctioned events," not because of the defendants' predicate acts. Id. at *25. A similar conclusion is warranted in this case.

"When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led *directly* to the Plaintiff's injuries." Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 461 (2006) (emphasis added). In other words, the focus is not "on whether the harm to the RICO plaintiff was a foreseeable result of the defendant's conduct or even whether it was 'the intended consequence[] of [that] behavior,' but rather on 'the directness of the relationship between the conduct and the harm.'" Slay's Restoration, LLC v.

Wright Nat'l Flood Ins. Co., 884 F.3d 489, 493 (4th Cir. 2018) (emphases removed) (quoting Hemi Grp., 559 U.S. at 12).

In his RICO case statement, Plaintiff states that "[t]he actions of the Enterprise and its conspirators were the direct and proximate cause of [his] injuries." (RICO Case Statement 48, ECF No. 17.) Those allegations, however, are precisely the sort of "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," that the court need not accept. Iqbal, 556 U.S. at 678. Moreover, although Plaintiff claims that "[b]ut for the fraudulent assurances to [him] and his parents that the gyms and coaches were certified safe, *the abuse* would not have been perpetrated," (RICO Case Statement 48-49, ECF No. 17) (emphasis added), nowhere does Plaintiff allege that he paid dues and fees as a direct result of any party's purported misrepresentations.[8] Rather, Plaintiff seemingly paid membership dues and

---

[8] To be sure, a plaintiff asserting a RICO claim based on wire or mail fraud "need not show, either as an element of its claim or as a prerequisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentations." Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 661 (2008). The plaintiffs in Bridge were regular participants in a county's tax lien auctions who alleged that the defendants' false attestations of compliance with the county's rule prohibiting simultaneous bidding deprived them of their fair share of winning bids. Id. 642-44. The Court held that the plaintiffs' RICO claims could proceed even though the defendants' misrepresentations were directed to and relied on by the county – and not the plaintiffs. The Court clarified, however, that

> none of this is to say that a RICO plaintiff who alleges injury 'by reason of' a pattern of mail fraud can prevail without showing that *someone* relied on the defendant's misrepresentations. . . . In most cases, the plaintiff will not be able to establish even but-for causation if no one relied on the misrepresentation.

Id. at 658 (emphasis in original). In contrast to Bridge, this case does not present a third-party reliance scenario. Thus, if Plaintiff (or his parents) did not rely on Defendants' alleged misrepresentations in paying Plaintiff's membership dues and competition fees, Plaintiff could not have been injured by reason of Defendants' alleged fraudulent scheme. After all, "a misrepresentation can cause harm only if a recipient of the misrepresentation relies on it." Id. at 656 n.6.

competition fees out of necessity to participate in events sanctioned by USASF and Varsity.  See (Compl. ¶ 48, ECF No. 1) ("After forming Defendant USASF, Defendant Webb mandated that All-Star athletes cheering on behalf of Varsity-affiliated gyms purchase a USASF membership as a requirement to competing at Varsity-sponsored events."); (Id. ¶ 53, ECF No. 1) ("All-Star athletes competing on behalf of Varsity-associated gyms pay monthly or annual fees to the gym as well as annual fees to the Varsity Defendants for competition attendance, uniforms, accessories, and other related fees." ); (Id. ¶¶ 221-22, ECF No. 1); see also Gilbert, 2019 WL 1058194, at *25.

Thus, having not adequately alleged that he was injured "by reason" of Defendants' predicate acts, Plaintiff cannot state a RICO claim based on the "membership dues, fees, and other incidental costs he paid to Defendants."  (RICO Case Statement 48, ECF No. 17.)

### b. Enterprise

Even if Plaintiff could establish RICO standing, his § 1962(c) claim would still be subject to dismissal for failure to plausibly allege the existence of an association-in-fact enterprise.

A RICO enterprise "includes any . . . group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  "Such a group need not have a hierarchical structure or a 'chain of command'" or business-like characteristics such as "a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies." Boyle v. United States, 556 U.S. 938, 948 (2009).  Rather, "an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with

the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." Id. at 946.

Plaintiff alleges that all named Defendants formed an association-in-fact enterprise to "endanger[] [him] and other minor athletes by exposing them to illegal sexual abuse and exploitation" all while charging them dues and fees "to compete in the self-same system of abuse." (RICO Case Statement 37, ECF No. 17). Plaintiff, though, has pled no facts to suggest that the Rockstar coaches shared a common purpose with the Varsity Defendants, Webb, USASF, USA Cheer, Bain, and Charlesbank. Indeed, based on the facts alleged in Plaintiff's complaint and RICO case statement, the individual coaches and corporate entities had divergent goals: the coaches sought to prey on minor athletes for their own sexual or personal gratification; the corporate entities sought to retain athletes and attract new ones to generate more money. Cf. Baker v. IBP, Inc., 357 F.3d 685, 691 (7th Cir. 2004) (Easterbrook, J.) (no common purpose where employer allegedly hired undocumented workers to depress wages because the employer "want[ed] to pay lower wages," "the recruiters want[ed] to be paid more for services rendered," and the immigrant-welfare organization "want[ed] to assist members of its ethnic group"); McPeters v. Edwards, 806 F. Supp. 2d 978, 988-89 (S.D. Tex. 2011) (no common purpose because the defendant judge's "purpose in ordering e-filing was to encourage efficiency, while LexisNexis's purpose was to generate profits"); Marshall v. Goguen, Cv 21-19-M-DWM, 2022 WL 1641776, *17 (D. Mont. May 24, 2022) (unpublished) (no common purpose because one defendant "sought to preserve his reputation, while [other defendants] sought to financially benefit off him"), appeal filed, 22-35499 (9th Cir. June 27, 2022). It strains credulity to suggest, as Plaintiff does, that Webb, Varsity, its corporate owners, and

cheerleading's governing bodies intended to subject the very athletes they relied on as a major revenue source to "illegal sexual abuse and exploitation" as a means of generating further profits.  (RICO Case Statement 37, ECF No. 17.)  In short, without nonconclusory allegations that Webb shared a common purpose with the perpetrators of the alleged abuse, Plaintiff has failed to allege a RICO enterprise.

### c. Racketeering Activity

Finally, even if Plaintiff had RICO standing and had adequately alleged that an enterprise existed, Plaintiff would still need to allege that Webb personally committed two predicate acts of racketeering activity to survive dismissal.  See, e.g., DeFalco v. Bernas, 244 F.3d 286, 306 (2d Cir. 2001) ("The requirements of section 1962(c) must be established as to each individual defendant."); In re Wellpoint, Inc. Out-of-Network Rates Litig., 865 F. Supp. 2d 1002, 1035 (C.D. Cal. 2011) ("Where RICO is asserted against multiple defendants, a plaintiff must allege at least two predicate acts by *each* defendant." (emphasis in original)); Kerrigan v. ViSalus, Inc., 112 F. Supp. 3d 580, 605 (E.D. Mich. 2015) (same).

"RICO is founded on the concept of racketeering activity."  RJR Nabisco, Inc. v. European Cmty., 579 U.S. 325, 329 (2016).  The RICO statute contains an exhaustive list of predicate acts that qualify as "racketeering activity."  18 U.S.C. § 1961(1).  Included in the list is "any act which is indictable under" 18 U.S.C. § 1341 (mail fraud) or 18 U.S.C. § 1343 (wire fraud).  18 U.S.C. § 1961(1)(B).

To state a claim for mail or wire fraud, a plaintiff must plausibly allege: "(1) the existence of a scheme to defraud and (2) the use of the mails or wire communication in furtherance of the scheme."  United States v. Curry, 461 F.3d 452, 457 (4th Cir. 2006).  Because

the "gravamen" of mail and wire fraud "is the scheme to defraud," Bridge, 553 U.S. at 647, even

"innocent" or "routine" mailings or wire transmissions can satisfy the second element as long as

the use of mail or wires somehow furthered the fraudulent scheme, Schmuck v. United States,

489 U.S. 705, 715 (1989). Nevertheless, "a plaintiff still needs to allege a material

misrepresentation as part of the defendants' scheme to [de]fraud to state a violation of section

1341 or 1343." Williams v. Affinion Grp., LLC, 889 F.3d 116, 125 (2d Cir. 2018); Neder v.

United States, 527 U.S. 1, 25 (1999).

A plaintiff relying on mail or wire fraud as predicate acts must also satisfy the

heightened pleading standard of Federal Rule of Civil Procedure 9(b). Jones v. Ram Med., Inc.,

807 F. Supp. 2d 501, 513 (D.S.C. 2011). Rule 9(b) requires a plaintiff alleging fraud to "state

with particularity the circumstances constituting [the] fraud." Those circumstances include "the

time, place, and contents of the false representations, as well as the identity of the person making

the misrepresentation and what he obtained thereby," Edmonson v. Eagle Nat'l Bank, 922 F.3d

535, 553 (4th Cir. 2019) (internal quotation marks omitted) – or more simply, "the who, what,

when, where, and how of the alleged fraud," United States ex rel. Taylor v. Boyko, 39 F.4th 177,

189 (4th Cir. 2022) (internal quotation marks omitted).

In this case, Plaintiff falls well short of plausibly alleging that Webb committed mail or

wire fraud. Plaintiff has not identified a single misrepresentation attributable to Webb – let

alone when it was made or how it was false or misleading. See Xia Bi v. McAuliffe, 927 F.3d

177, 184-85 (4th Cir. 2019) ("How and whether a party relied on a misstatement is every bit as

much a 'circumstance[] constituting fraud' as any other element." (quoting Fed. R. Civ. P.

9(b))). In fact, all the representations on which Plaintiff relies in support of his mail and wire

fraud claims are attributable to other Defendants.  (Compl. ¶ 251(a), ECF No. 1) ("USASF

Athlete Protection Messaging . . . ."); (Id. ¶ 251(e), ECF No. 1) ("In 2021, USASF's website

falsely claimed . . . ."); (Id. ¶ 251(f), ECF No. 1) ("In 2021, USASF also falsely claimed . . . .");

(Id. ¶ 251(g), ECF No. 1) ("USASF disseminated . . . ."); (Id. ¶ 251(h), ECF No. 1) ("USASF

continued to provide messaging . . . ."); (Compl. ¶ 251(j), ECF No. 1) ("USASF's athlete

protection messaging . . . ."); (RICO Case Statement 30-36, ECF No. 17) (listing Varsity and

USASF social media posts as well as "[r]epresentations from the Varsity website related to

participant safety").

Plaintiff's failure to plausibly allege that Webb committed mail fraud, wire fraud, or any

other predicate act listed in § 1961(1) is fatal to his § 1962(c) claim against Webb.

### d. RICO Conspiracy

Plaintiff's RICO conspiracy claim against Webb under § 1962(d) is also deficient.

Because Plaintiff lacks RICO standing and has not adequately alleged the existence of a RICO

enterprise, he cannot assert a § 1962(c) claim against any Defendant.  Without a viable

§ 1962(c) claim, his conspiracy claim under § 1962(d) necessarily fails, too.  GE Inv. Priv.

Placement Partners II v. Parker, 247 F.3d 543, 551 n.2 (4th Cir. 2001); Foster v. Wintergreen

Real Estate Co., 363 F. App'x 269, 275 n.6 (4th Cir. 2010) (unpublished).

Even if Plaintiff had sufficiently alleged a substantive RICO violation, his § 1962(d)

claim would still be subject to dismissal for failure to state a claim.  "To satisfy § 1962(d), the

plaintiff must establish two elements: (1) that two or more people agreed that some member of

the conspiracy would commit at least two racketeering acts (i.e. a substantive RICO offense)

and, (2) that the defendant knew of and agreed to the overall objective of the RICO offense."

Borg v. Warren, 545 F. Supp. 3d 291, 319 (E.D. Va. 2021).  In describing the alleged

conspiracy, Plaintiff states that Defendants "operated as a single unified entity with the common

goal of taking billions of dollars from minor athletes who wanted to be a part of Defendants'

All-Star cheer world" and that Defendants "act[ed] as a collective group" in "endangering

[him]."  (RICO Case Statement 47, ECF No. 17.)  Apart from these conclusory allegations,

Plaintiff has alleged no facts tending to show that each Defendant agreed that some member of

the conspiracy would commit at least two racketeering acts.  See Chambers v. King Buick

GMC, LLC, 43 F. Supp. 3d 575, 607 (D. Md. 2014) ("[B]ecause the core of a RICO civil

conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at the

very least, must allege specifically such an agreement."  (quoting Hecht v. Commerce Clearing

House, Inc., 897 F.2d 21, 25 (2d Cir. 1990))); Walters v. McMahen, 795 F. Supp. 2d 350, 355

(D. Md. 2011) (stating that a plaintiff bringing a § 1962(d) claim must "describe in detail the

conspiracy, including the identity of the co-conspirators, the object of the conspiracy, and the

date and substance of the conspiratorial agreement").

 For these reasons, Plaintiff has failed to state a valid § 1962(d) claim against Webb.

Count II is therefore dismissed in its entirety as to Webb.

### C. Pendent-Claim Personal Jurisdiction

 Having found that Plaintiff has not stated a plausible CAVRA or RICO claim under Rule

12(b)(6), meaning there is no viable anchor claim, the court declines to exercise pendent-claim

personal jurisdiction over Plaintiff's gross-negligence and civil-conspiracy claims against Webb.

Bettis, 976 F. Supp. 2d at 751 ("If . . . the court dismisses [the] federal claim providing personal

jurisdiction – also known as the 'anchor' federal claim – early in the litigation, the court may, in

its discretion, dismiss the remaining federal and state claims."), aff'd, 693 F. App'x 190 (4th

Cir. 2017) (unpublished); Geller, 264 F. Supp. 2d at 387-88 ("[I]f the court were later to

determine that the federal claim(s) should be dismissed against a defendant, the state claims

against that defendant would also have to be dismissed, unless another basis for asserting

personal jurisdiction exists."); United States v. Botefuhr, 309 F.3d 1263, 1274 (10th Cir. 2002)

(holding that the district court abused its discretion by retaining jurisdiction over remaining

claims after dismissing the anchor claim). Unless Plaintiff can identify an independent basis for

personal jurisdiction, his state-law claims against Webb will be dismissed as well. Thus, the

court next considers whether personal jurisdiction over Webb is proper under South Carolina's

long-arm statute.

**D. Whether Webb is Subject to General or Specific Jurisdiction in South Carolina**

A federal court may exercise personal jurisdiction over a nonresident defendant if (1) the

forum state's long-arm statute authorizes the exercise of jurisdiction and (2) the exercise of

jurisdiction comports with the Due Process Clause of the Fourteenth Amendment. Ellicott

Mach. Corp. v. John Holland Party Ltd., 995 F.2d 474, 477 (4th Cir. 1993). Where, as here, the

forum state's long-arm statute extends to the limits of federal due process, the two-part inquiry

collapses into one: whether the court's exercise of personal jurisdiction satisfies the Fourteenth

Amendment's Due Process Clause. Foster v. Arletty 3 SARL, 278 F.3d 409, 414 (4th Cir.

2002). The Fourteenth Amendment prevents a federal court from exercising jurisdiction unless

the defendant has "such 'contacts' with the forum State that 'the maintenance of the suit' is

'reasonable' . . . and 'does not offend traditional notions of fair play and substantial justice.'"

28

Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct., 141 S. Ct. 1017, 1024 (2021) (quoting Int'l Shoe

Co. v. Washington, 326 U.S. 310, 316-17 (1945)).

   The Supreme Court has recognized two types of personal jurisdiction: general and

specific.  Id.  General jurisdiction attaches when a defendant's connections with the forum "are

so continuous and systematic as to render them essentially at home in the forum State."  BNSF

Ry. Co. v. Tyrrell, 581 U.S. 402, 413 (2017) (internal quotation marks omitted).  A natural

person is considered "at home" where he or she is domiciled.  Daimler AG v. Bauman, 571 U.S.

117, 137 (2014).  General jurisdiction does not exist in this case because Webb is domiciled in

Tennessee.  (Compl. ¶ 19, ECF No. 1.)

   The second type of personal jurisdiction – specific jurisdiction – exists when a case

"aris[es] out of or relate[s] to the defendant's contacts with the forum."  Helicopteros Nacionales

de Colombia, S.A. v. Hall, 466 U.S. 408, 414 n. 8 (1984).  To determine whether specific

jurisdiction exists, courts in the Fourth Circuit consider "(1) the extent to which the defendant

has purposefully availed itself of the privilege of conducting activities in the state; (2) whether

the Plaintiff's claims arise out of those activities directed at the state; and (3) whether the

exercise of personal jurisdiction would be constitutionally 'reasonable.'"  Carefirst of Md., Inc.

v. Carefirst Pregnancy Ctrs., Inc., 334 F.3d 390, 397  (4th Cir. 2003) (quoting ALS Scan, Inc. v.

Digital Serv. Consultants, Inc., 293 F.3d 707, 711-12 (4th Cir. 2002)).  "The plaintiff must

prevail on each prong."  Perdue Foods LLC v. BRF S.A., 814 F.3d 185, 189 (4th Cir. 2016).

   For the first prong, a defendant has purposefully availed itself of the benefits and

protections of the forum state's law if "the defendant deliberately has engaged in significant

activities within [the forum]" or "has created continuing obligations between [itself] and

residents of the forum." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475-76 (1985) (internal quotation marks omitted). This purposeful-availment standard "ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts," or due to "the unilateral activity of another party or a third person." Id. at 475 (internal quotation marks omitted).

For the second prong – whether the Plaintiff's claims arise out of or relate to the defendant's activities directed at the forum – "there must be an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State." Bristol-Myers Squibb Co. v. Super. Ct. of Cal., 582 U.S. 255, 262 (2017) (internal quotation marks omitted and alteration in original). "When there is no such connection, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State." Id.

At the final prong, the court considers whether the exercise of jurisdiction "would comport with 'fair play and substantial justice.'" Burger King, 471 U.S. at 476 (quoting Int'l Shoe, 326 U.S. at 320). In doing so, the court weighs "the burden on the defendant, the forum State's interest in adjudicating the dispute, the Plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." Christian Sci. Bd. of Dirs. of the First Church of Christ, Scientist v. Nolan, 259 F.3d 209, 217 (4th Cir. 2001) (quoting Burger King, 471 U.S. at 477).

In this case, Webb argues that Plaintiff has failed to show that he has purposefully availed himself of the privilege of doing business in South Carolina. To support this argument,

Webb has submitted an affidavit detailing his lack of contacts with South Carolina.  Webb states

that he does not own property in South Carolina, does not maintain a South Carolina bank

account, has never entered a contract governed by South Carolina law or to be performed in

South Carolina, and has visited the state once, to attend a political dinner in 2018.  (Webb Mot.

Dismiss Ex. 2 (Webb Aff. ¶¶ 3-6), ECF No. 38-2.)  Besides attending the political dinner, the

extent of Webb's personal contacts with South Carolina are limited to a single payment he made

to a South Carolina resident in connection with a book he was working on.  (Id. Ex. 2 (Webb

Aff. ¶ 7), ECF No. 38-2.)  Plaintiff offers no evidence to contradict these assertions.

Instead, Plaintiff seeks to establish personal jurisdiction over Webb based largely on his

roles with the Varsity Defendants.  Webb was president and CEO of Varsity "from its inception

until stepping down from the CEO role on March 3, 2016, " and continued serving as the

chairman of Varsity's board of directors until July 2018.  (Id. Ex. 2 (Webb Aff. ¶ 8), ECF No.

38-2.)  After stepping down as chairman, Webb "continued to be employed by Varsity until

December 2020."  (Id. Ex. 2 (Webb Aff. ¶ 8), ECF No. 38-2.)  Plaintiff alleges that as Varsity's

founder and longtime CEO, Webb "exercised control over all aspects of All-Star cheer,

including rulemaking," and "was at the forefront of the conception and execution of the alleged

unlawful conspiracy."  (Compl. ¶ 77, ECF No. 1.)  Plaintiff also alleges that the All Star

competition environment was Webb's "brainchild" and that he "used the competitions as a

mechanism for his companies to establish dominance in the cheer market."  (Id. ¶ 137, ECF

No. 1.)

Just as importantly, Plaintiff contends that Webb, through Varsity, has had significant

contacts with South Carolina and Scott Foster in particular.  Plaintiff points out that Varsity

31

conducts several events in South Carolina every year, has a registered agent in South Carolina, and employs multiple sales representatives as well as a "dedicated advisor" in the state.  (Resp. Opp'n Webb Mot. Dismiss 13, ECF No. 62.)  As for Varsity's connections with Scott Foster, Plaintiff notes that Varsity purchased Foster's company, World Spirit Federation, in 2006 and hired Foster in 2011 as a brand manager for a new cheer competition dubbed "Cheerlebrity." (Id. at 14-15, ECF No. 62.)  Varsity provided Foster with a Varsity email address, and his cell phone number was listed on the Cheerlebrity website.  (Id. at 14-15, ECF No. 62.)  Foster later led several sessions at a Varsity gym owners conference in Las Vegas in 2012.  (Id. at 15, ECF No. 62.)

Webb counters that he cannot be subject to personal jurisdiction in South Carolina based on his roles with Varsity under the fiduciary shield doctrine.  (Webb's Mem. Supp. Mot. Dismiss 18-20, ECF No. 38-1.)  The fiduciary shield doctrine holds that "the acts of a corporate officer or employee taken in his corporate capacity within the jurisdiction generally [cannot] form the predicate for jurisdiction over him in his individual capacity."  Columbia Briargate Co. v. First Nat'l Bank, 713 F.2d 1052, 1055-56 (4th Cir. 1983) (quoting Bulova Watch Co. v. K. Hattori & Co., Ltd., 508 F. Supp. 1322, 1347 (E.D.N.Y. 1981)).  The Fourth Circuit, however, has explicitly rejected such a broad application of the fiduciary shield doctrine:

> [W]hen a non-resident corporate agent is sued for a tort committed by him in his corporate capacity in the forum state in which service is made upon him without the forum under the applicable state long-arm statute as authorized by Rule 4(e), he is properly subject to the jurisdiction of the forum court, provided the long-arm statute of the forum state is co-extensive with the full reach of due process.

Id. at 1064 (emphasis removed).  In other words, corporate defendants are not insulated from jurisdiction simply because their forum-related actions were performed in their official capacity.

See ePlus Tech., Inc. v. Aboud, 313 F.3d 166, 177 (4th Cir. 2002) (holding that an individual defendant "[was] not immune from jurisdiction in Virginia merely because her contacts with the Commonwealth were made ostensibly on behalf of [her employer]").  Rather, when the forum's long-arm statute extends to the limit of federal due process, jurisdiction is proper upon "some showing of direct, personal involvement by the corporate officer in some decision or action which is causally related to the plaintiff's injury," such as when the defendant was the "guiding spirit" or "central figure" behind the wrongful conduct.  Columbia Briargate, 713 F.2d at 1063 (quoting Escude Cruz v. Ortho Pharm. Corp., 619 F.2d 902, 907 (1st Cir. 1980)).

To this end, Plaintiff requests that "formal discovery on the limited issue of Defendant Webb's level of control in Varsity's operations . . . should be allowed to proceed before this jurisdictional issue can be decided."  (Resp. Opp'n Webb Mot. Dismiss 16-17, ECF No. 62.) Considering that Webb was not only Varsity's founder, CEO, and chairman but also the alleged architect of the All Star cheerleading industry, the court finds that jurisdictional discovery is appropriate at this stage on the extent of Webb's involvement in Varsity's contacts with South Carolina and Foster.  Base Metal Trading, Ltd. v. OJSC "Novokuznetsky Aluminum Factory", 283 F.3d 208, 216 n.3 (4th Cir. 2002) ("[T]he decision of whether or not to permit jurisdictional discovery is . . . committed to the sound discretion of the district court."); Sportrust Assocs. Int'l, Inc. v. The Sports Corp., 304 F. Supp. 2d 789, 794 (E.D. Va. 2004) ("The 'broad discretion' entrusted to district courts in their resolution of discovery problems applies to jurisdictional discovery." (quoting Carefirst Pregnancy Ctrs., 334 F.3d at 402)).  At an appropriate point in the future, Plaintiff will, of course, be required to establish by a preponderance of the evidence that personal jurisdiction extends to Webb.

33

### E. Webb's Rule 12(b)(6) Challenges to Plaintiff's Gross-Negligence and Civil-Conspiracy Claims

Lastly, the court turns to Webb's arguments that Plaintiff's remaining state-law claims should be dismissed for failure to state a claim under Rule 12(b)(6).

### 1. Gross Negligence (Count IV)

A negligence claim consists of three elements: "(1) a duty of care owed by the defendant to the plaintiff; (2) a breach of that duty by a negligent act or omission; and (3) damage proximately resulting from the breach." Carolina Chloride, Inc. v. Richland Cnty., 714 S.E.2d 869, 873 (S.C. 2011) (quoting Tanner v. Florence Cnty. Treasurer, 521 S.E.2d 153, 158 (S.C. 1999)). "If any of these elements is absent a negligence claim is not stated." Summers v. Harrison Constr., 381 S.E.2d 493, 495 (S.C. Ct. App. 1989).

"Gross negligence is the intentional conscious failure to do something which it is incumbent upon one to do or the doing of a thing intentionally that one ought not to do." Etheredge v. Richland Sch. Dist. One, 534 S.E.2d 275, 277 (S.C. 2000). In other words, "[i]t is the failure to exercise slight care." Id. "In most cases, gross negligence is a factually controlled concept whose determination best rests with the jury." Faile v. S.C. Dep't of Juv. Just., 566 S.E.2d 536, 545 (S.C. 2002). But "when the evidence supports but one reasonable inference, the question becomes a matter of law for the court." Etheredge, 534 S.E.2d at 277.

"In South Carolina, there is a strong presumption that an officer or a director of a corporation is not, merely as a result of his standing as such, personally liable for torts of the corporation. However, in those rare cases where a corporate director has in some way participated in or directed the tortious act, personal liability will attach." Steinke v. Beach Bungee, Inc., 105 F.3d 192, 195 (4th Cir. 1997) (internal quotation marks and citation omitted).

34

Webb argues that he did not owe Plaintiff a duty, and that even if he did, Plaintiff has not sufficiently alleged that he breached that duty. (Webb's Mem. Supp. Mot. Dismiss 35-38, ECF No. 38-1.) The court begins with the threshold issue of whether Webb owed Plaintiff a duty of care. Fisher v. Shipyard Vill. Council of Co-Owners, Inc., 781 S.E.2d 903, 912 (S.C. 2016) ("A court must first determine, as a matter of law, whether the law recognizes a particular duty.")

"An affirmative legal duty exists only if created by statute, contract, relationship, status, property interest, or some other special circumstance." Hendricks v. Clemson Univ., 578 S.E.2d 711, 714 (S.C. 2003). South Carolina law recognizes that "there is no general duty to control the conduct of another or to warn a third person or potential victim of danger." Madison v. Babcock Ctr., Inc., 638 S.E.2d 650, 656 (S.C. 2006). There are, however, five exceptions to this general rule:

> (1) where the defendant has a special relationship to the victim; (2) where the defendant has a special relationship to the injurer; (3) where the defendant voluntarily undertakes a duty; (4) where the defendant negligently or intentionally creates the risk; and (5) where a statute imposes a duty on the defendant.

Id. Plaintiff argues that the second, third, and fourth exceptions apply. (Resp. Opp'n Webb Mot. Dismiss 29-31, ECF No. 62.)

The second exception arises "when the defendant 'has the ability to monitor, supervise and control an individual's conduct' *and* when "'the individual has made a specific threat of harm directed at a specific individual.'" Doe v. Marion, 645 S.E.2d 245, 250 (S.C. 2007) (emphasis added) (quoting Bishop v. S.C. Dep't of Mental Health, 502 S.E.2d 78, 81 (S.C. 1998)). Setting aside whether Plaintiff has adequately alleged that Webb could control the individual coaches' conduct, nothing in the complaint suggests that Webb was aware of a specific threat of harm aimed at Plaintiff. See id. ("[I]t is not simply foreseeability of the victim

35

which gives rise to a person's liability for failure to warn; rather, it is the person's awareness of a distinct, specific, overt threat of harm which the individual makes towards a particular victim." (quoting Gilmer v. Martin, 473 S.E.2d 812, 814 (S.C. Ct. App. 1996))).  Thus, Plaintiff cannot rely on the second exception to establish a duty.

Turning next to the third exception, South Carolina follows the negligent-undertaking rule set forth in § 323 of the Restatement (Second) of Torts, Wright v. PRG Real Est. Mgmt., 826 S.E.2d 285, 290-91 (S.C. 2019).  Section 323 states:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>    (a) his failure to exercise such care increases the risk of such harm, or
>    (b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts § 323 (Am. Law. Inst. 1965).

As for the fourth exception, a duty may arise when "a defendant creates 'a situation that [it] knew or should have known posed a substantial risk of injury' to a plaintiff."  In re Blackbaud, Inc., Customer Data Breach Litig., 567 F. Supp. 3d 667, 682 (D.S.C. 2021) (quoting Edwards v. Lexington Cnty. Sheriff's Dep't, 688 S.E.2d 125, 130 (S.C. 2010)).  In light of these principles, the court finds that Plaintiff has alleged facts sufficient to show that Webb owed him a duty of care under the third and fourth exceptions.

The complaint alleges that Defendants – including Webb as the alleged architect of the competitive cheerleading industry – were "responsible for the safety, health, and welfare" of Plaintiff, who was both a USASF member and a participant in Varsity events.  (Compl. ¶¶ 19, 48, 77, 267, ECF No. 1.)  Plaintiff states that Webb and other Defendants knew of the "dangers" posed by the competitive cheerleading environment and thus created "rules, policies

and/or procedures specifically intended to address the risks of sexual, physical, and mental exploitation of minor athletes by coaches[] and adults." (Id. at ¶¶ 268-69, ECF No. 1); (Id. at ¶ 84, ECF No. 1) ("Webb and Varsity Spirit, LLC formed USA Cheer . . . to provide guidelines, policies, procedures, and processes to ensure an environment safe for young athletes throughout the cheer industry . . . ."). Yet, despite that knowledge and those guidelines, Defendants (including Webb) allegedly failed to vet coaches, investigate and report sexual abuse complaints, and enforce rules related to "chaperoning and supervis[ing] minors" and banning coaches. (Id. ¶¶ 208, 270, 274, ECF No. 1.)

Based on these allegations, the court finds that Plaintiff has sufficiently alleged that Webb owed Plaintiff a duty based on the third and fourth exceptions to the general "no duty to protect" rule. See In re Blackbaud, 567 F. Supp. 3d at 682 (finding a duty where plaintiff consumers had alleged that defendant cloud software company knew of the risk of cyberattacks and the inadequacy of its systems yet "failed to correct, update, or upgrade its security protections"). The court further finds that Plaintiff has sufficiently pled the breach, damages, and causation elements of his gross-negligence claim. Thus, Webb's motion to dismiss Count IV for failure to state a claim is denied.

### 2. Civil Conspiracy (Count XI)

To state a civil-conspiracy claim, a plaintiff must allege four elements: "(1) the combination or agreement of two or more persons, (2) to commit an unlawful act or a lawful act by unlawful means, (3) together with the commission of an overt act in furtherance of the agreement, and (4) damages proximately resulting to the plaintiff." Paradis v. Charleston Cty. Sch. Dist., 861 S.E.2d 774, 780 (S.C. 2021). Because "civil conspiracy is an intentional tort, an

intent to harm . . . [is] an inherent part of th[is] analysis." Id. at 780 n.9. A plaintiff asserting a civil-conspiracy claim must also allege acts "in furtherance of the conspiracy in a manner separate and independent from [their] other causes of action." Jinks v. Sea Pines Resort, LLC, No. 9:21-cv-00138-DCN, 2021 WL 4711408, at *3 (D.S.C. Oct. 8, 2021) (unpublished). Stated another way, if "the particular acts charged as a conspiracy are the same as those relied on as the tortious act or actionable wrong, plaintiff cannot recover damages for such act or wrong, and recover likewise on the conspiracy to do the act or wrong." Todd v. S.C. Farm Bureau Mut. Ins. Co., 278 S.E.2d 607, 611 (S.C. 1981), overruled on other grounds by Paradis, 861 S.E.2d at 780.

Here, Plaintiff has merely summarized the allegations underlying his other causes of action and repackaged them into a claim for civil conspiracy. Plaintiff's civil-conspiracy claim is the last count in his complaint. (Compl. ¶¶ 327-41, ECF No. 1.) It incorporates all preceding allegations and generally alleges that Defendants misrepresented the safety of their gyms and competitions, failed to take appropriate action when faced with allegations of abuse, and reaped substantial financial benefits in the form of dues and fees. (Id. ¶¶ 327, 330-31, 336-37, 339-40, ECF No. 1.) But because Plaintiff has not identified "additional acts in furtherance of the conspiracy separate and independent from other wrongful acts alleged in [his] complaint," Hackworth v. Greywood at Hammett, LLC, 682 S.E.2d 871, 875 (S.C. Ct. App. 2009), overruled on other grounds by Paradis, 861 S.E.2d at 780, he has failed to state a valid claim for civil conspiracy. As a result, the court grants Webb's motion to dismiss Count XI.

## IV. CONCLUSION

To summarize, the court has personal jurisdiction over Plaintiff's CAVRA and RICO claims against Webb under those statute's nationwide-service-of-process provisions. Both

claims, however, are subject to dismissal under Rule 12(b)(6) for failure to state a claim.

As for Plaintiff's state-law claims against Webb, the court finds that jurisdictional discovery is appropriate to determine the extent of Webb's involvement in Varsity's contacts with South Carolina and Scott Foster.  Jurisdictional discovery shall take place concurrently with merits discovery.  As noted earlier, Plaintiff will eventually be required to prove that personal jurisdiction exists by a preponderance of the evidence.

Finally, as for Webb's Rule 12(b)(6) challenges to Plaintiff's state-law claims, the court finds that Plaintiff has stated a plausible claim for gross negligence, but not for civil conspiracy.

It is therefore

**ORDERED** that Webb's motion to dismiss, document number 38, is granted in part and denied in part.

**IT IS SO ORDERED.**

s/Henry M. Herlong, Jr.
Senior United States District Judge

Greenville, South Carolina
June 26, 2023